[No. 45014.   En Banc.   July 20, 1978.]

KAREN MARCHIORO, ET AL, *Respondents*, v. NEALE V. CHANEY, ET AL, *Appellants.*

*Daniel Brink* and *Winship A. Todd, Jr.* (of *Trethewey & Brink*), for appellants.

*Wickwire, Lewis, Goldmark, Dystel & Schorr,* by *Charles A. Goldmark,* for respondents.

DOLLIVER, J.—This is an action for declaratory and injunctive relief brought by plaintiffs who are active in the affairs of the Democratic Party in the State of Washington. Included are the chairwoman of the King County Democratic Central Committee, the chairmen of the Pierce County and Spokane County Democratic Central Committees, and several members of the Democratic Party of the State of Washington. Defendants are the incumbent chairman and the members of the Washington State Democratic Committee, established in conformity with RCW 29.42.020.

The bases of plaintiffs' action are that (1) RCW 29.42-.020 and .030, which provide the two members of the State Democratic Committee elected by the county central committees be of the opposite sex and the chairman and vice–chairman of the State Democratic Committee be of the opposite sex, violate Const. art. 31, the equal rights amendment (ERA); (2) RCW 29.42.020, by regulating the size and composition of the State Democratic Committee, violates the right of freedom of association found in the first amendment to the United States Constitution and Const. art. 1, § 4, the right to assemble; and (3) the "Charter of the Democratic Party of Washington" adopted by the Washington State Democratic Convention in Olympia on June 12, 1976, which, *inter alia,* in article 4(G)4 provided for the composition of the state committee, is binding on the State Democratic Committee. Article 4(G)4 specifically provides:

The State Democratic Committee membership shall be organized according to state law: however, in addition to having two (2) delegates per county as voting members, each legislative district shall elect one voting member. Each district representative shall be allowed to vote on all matters or issues, policies and goals which would reasonably fall within the function of the state convention and as allowed by state law. Legislative district representatives shall be elected by the Legislative district organization at their organization meeting, or by the county chairpersons and the state committee persons of the counties within the district with their votes being weighted on the same basis as the last previous state convention in those districts with more than one county.

The trial court granted summary judgment for plaintiffs on each of these claims. We reverse on issues (1) and (2) and partly affirm and partly reverse on issue (3).

The state committee referred to in RCW 29.42.020 and .030 was created by laws enacted in 1909. Laws of 1909, ch. 82, § 6, p. 175. At that time, the state committee was composed of one member elected by the county committee from each county. In 1927, the composition from each county to the state committee was changed to one committeeman and one committeewoman. Laws of 1927, ch. 200, § 1, p. 287. In 1939, the requirement was enacted which provided for officers of the state and county committees and the further mandate that they must include a chairman and vice–chairman who shall be of the opposite sex. Laws of 1939, ch. 48, § 1, p. 153. Regulation by statute of political parties in this state has been in effect since 1907. Laws of 1907, ch. 209, p. 457. State committees, whose size and composition were mandated by statute, have been in effect since 1909; equal representation by sex of the governing body of the state committee has been required since 1927; and a state committee chairman and vice–chairman of the opposite sex have been required since 1939.

Before proceeding to the substantive issues, there is a procedural matter to be considered. Defendants argue the trial court did not have jurisdiction because of plaintiffs'

failure to join the State Republican Committee in this action. Defendants point to RCW 7.24.110 which requires joinder of "all persons . . . who have or claim any interest which would be affected" in an action for declaratory relief and to CR 19 which requires the joinder of indispensable parties. It is alleged the State Republican Committee, also constituted by RCW 29.42.020, has an interest which will be affected should that statute or portions of it be held unconstitutional: *i.e.,* defendants allege if the statute is held unconstitutional, all state committees established under it, since they have no other statutory authority, will cease to exist.

■ We have held joinder is required only when the interest of the other persons might be adversely affected by the proceedings. *Williams v. Poulsbo Rural Tel. Ass'n,* 87 Wn.2d 636, 643, 555 P.2d 1173 (1976). Also, CR 19(a)(2)(A) requires joinder when a person claims an interest and the proceedings may "as a practical matter impair or impede his ability to protect that interest". Thus, the question is whether an interest of the State Republican Committee may be prejudiced by the proceedings.

RCW 29.42.020 establishes state committees as integral parts of the party organization. *King County Republican Cent. Comm. v. Republican State Comm.,* 79 Wn.2d 202, 211, 484 P.2d 387 (1971). It also enumerates certain powers of the state committee and provides for a meeting in January of each odd–numbered year. Even if a portion of a statute is void, the entire statute need not be struck down unless the invalid portion is unseverable. *See State ex rel. Distilled Spirits Inst., Inc. v. Kinnear,* 80 Wn.2d 175, 176, 492 P.2d 1012 (1972).

Here, as pointed out by plaintiffs, the relief sought would serve only to lift restrictions on the party's power to constitute its state committee; it would not eliminate the committee. Thus, although the requirement that committee members be of a certain sex or be chosen pursuant to a certain formula may be void, the statutory establishment

and enumeration of powers would remain, and the committee would not cease to exist or be hindered in any way. The real interest of the State Republican Committee is to exercise the powers enumerated in RCW 29.42.020. The continued exercise of these powers is not threatened by this action. We hold no interest is prejudiced, and we hold the trial court had jurisdiction.

I

## THE EQUAL RIGHTS AMENDMENT

Prior to reaching the ERA issue, we must address defendants' argument that plaintiffs have made no showing of actual or imminent injury to themselves and thus have no standing. Defendants further contend this is not an exceptional case of broad public import allowing the court to decide an otherwise nonjusticiable issue within the rule of *Huntamer v. Coe,* 40 Wn.2d 767, 246 P.2d 489 (1952). *State ex rel. Distilled Spirits Inst., Inc. v. Kinnear, supra,* citing *Huntamer,* held a question of public interest which has been adequately briefed and argued may be decided by the court in an advisory opinion if to do so would be beneficial to the public and to government officers. Because we hold plaintiffs have standing, we need not reach the question of whether this is such an exceptional case of broad public import as to overcome lack of standing.

A person has standing to raise constitutional questions when his interest is a "'personal stake in the outcome of the controversy.'" *DeFunis v. Odegaard,* 82 Wn.2d 11, 24, 507 P.2d 1169 (1973). In *Maxey v. Washington Democratic Comm.,* 319 F. Supp. 673, 677 (W.D. Wash. 1970), the court held state party officers and members who participate regularly in the selection of their representatives (in that case to state and national conventions) "have a deep personal stake in the outcome" of a challenge to the constitutionality of selection procedures.

Plaintiffs here identify two interests which give them a "stake in the outcome" of this issue: First they assert that,

if the party is allowed to supplement the number of members on the state committee with legislative district representatives, the 50–50 sex division may be applicable to newly created committee seats, thus threatening at least two of the plaintiffs with exclusion on the basis of their sex. The second interest asserted is that of electing party officials by voting one's conscience free from statutory sex criteria.

We hold plaintiffs have a sufficient interest to give them standing and that all the elements of a justiciable controversy under the Uniform Declaratory Judgments Act (RCW 7.24) are present, pursuant to the interpretation of that statute in *State ex rel. O'Connell v. Dubuque,* 68 Wn.2d 553, 558, 413 P.2d 972 (1966).

While we agree with plaintiffs on the question of standing, we disagree with their views that RCW 29.42.020 and .030 violate the equal rights amendment. Const. art. 31, § 1, approved in 1972, reads as follows:

> Equality of rights and responsibility under the law shall not be denied or abridged on account of sex.

In memoranda to the trial court and briefs to this court, plaintiffs assert the equal rights amendment forbids any classification based on sex. They cite *Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975), in support of this view. This is not, however, what *Darrin* said. The determination that classification by sex is suspect, which is the key to the analysis used under equal protection (*Hanson v. Hutt,* 83 Wn.2d 195, 517 P.2d 599 (1973)), has been replaced by the new demands of the equal rights amendment. As we said in *Darrin v. Gould, supra* at 871:

> Const. art. 31, provided the latest expression of the constitutional law of the state, dealing with sex discrimination, as adopted by the people themselves. Presumably the people in adopting Const. art. 31 intended to do more than repeat what was already contained in the otherwise governing constitutional provisions, federal and state, by which discrimination based on sex was permissible under the rational relationship and strict scrutiny tests. Any

other view would mean the people intended to accomplish no change in the existing constitutional law governing sex discrimination, except possibly to make the validity of a classification based on sex come within the suspect class under Const. art. 1, § 12. *See* footnote 7, *supra.* Had such a limited purpose been intended, there would have been no necessity to resort to the broad, sweeping, mandatory language of the Equal Rights Amendment. *See* Comment, *Sex Discrimination in Interscholastic High School Athletics,* 25 Syracuse L. Rev. 535, 570–74 (1974).

*Darrin* makes clear that the old approach of sex as a suspect class, strict scrutiny and proof of compelling state interest enunciated in *Hanson v. Hutt, supra,* has been swept away by the equal rights amendment. *See* Brown, Emerson, Falk & Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women,* 80 Yale L.J. 871, 904 (1971).

Under the equal rights amendment, the equal protection/suspect classification test is replaced by the single criterion: Is the classification by sex discriminatory? or, in the language of the amendment, Has equality been denied or abridged on account of sex? In the language of *Darrin v. Gould* at page 877, "under our ERA *discrimination* on account of sex is forbidden." (Italics ours.) *See Singer v. Hara,* 11 Wn. App. 247, 257, 522 P.2d 1187 (1974).

The thrust of the equal rights amendment (*see, e.g.,* 80 Yale L.J. 871 (1971), *supra;* Comment, *Equal Rights Provisions: The Experience Under State Constitutions,* 65 Cal. L. Rev. 1086 (1977)), is to end special treatment for or discrimination against either sex. As stated in California Comm'n on the Status of Women, *Impact ERA: Limitations and Possibilities* (1976) at page 8: "[P]ower need not imply hierarchy; power can be shared, and ERA advocates desire female equality not superiority." *See also* Official Voters Pamphlet, November 7, 1972, House Joint Resolution 61, at 52–53, especially "Statement for" at page 52.

The Yale Law Journal analysis, contrary to the views of plaintiffs, does not forbid the type of legislation found in

RCW 29.42.020 and .030. As the article states, at page 904, "This does not mean, however, that the government would be powerless to take measures designed to assure women actual as well as theoretical equality of rights." This is precisely the purpose of this legislation.

What are the rights involved here? They are (1) the right to run for a position on the state committee of a major political party and to run for the position of chairman or vice–chairman of the state committee; and (2) the right as a member of the state committee or as one of the two statutory officers of the state committee to play a role in the leadership of a major political party. What has been done to assure women actual as well as theoretical equality of these rights? The legislature has found that in the conduct of the offices of state committees there shall be an absolute equality of rights between the sexes. An equal number of both sexes must be elected to the committee and as chairman and vice–chairman of the state committee. Neither sex may predominate. Neither may discriminate or be discriminated against. There is an equality of numbers and an equality of rights to be in office and to control the affairs of the state committee. The ironic result of plaintiffs' theory would be to abolish a statute which mandates equality by invoking a provision of the constitution passed to guarantee equality.

The major objection of plaintiffs seems to be the mandate by statute that one of the positions on the state committee from each county is reserved for a female and the other for a male and that this violates the equal rights amendment. But if the statute simply said, "The state committee of each major political party shall be composed of an equal number of women and men" there clearly would be no abridgment or denial on account of sex of any equality of rights under the law. We have found no case or any literature which suggests mandated equality by statute would violate the equal rights amendment.

If equality under the statute is not offensive to the equal rights amendment, then certainly, as here, the state may

adopt a rational means—one male and one female state committee member from each county—to achieve the equality required.

As commentators have consistently stated (see 80 Yale L.J. 871, 920 et seq.), the equal rights amendment does not permit special exemptions or exceptions because of sex, e.g., "protective" labor legislation applicable to women only. These laws generally provided special benefits, excluded women from particular occupations or from employment under certain conditions, or restricted conditions of employment. They are exclusionary statutes which apply to one sex only and are in no way comparable to the statutory scheme considered here. See Hanson v. Hutt, supra; see also Official Voters Pamphlet, November 7, 1972, supra.

The marital community and the community property statutes in this state are in some ways analogous to the situation in this case. The "governing parties" in a marriage must be male and female—one of each. RCW 26.04; Singer v. Hara, supra. The persons in the marital community are vested with equal power to manage the affairs of the community and its property. RCW 26.16.030. Thus, while there is certainly a classification, there is equality of treatment and this is sufficient to meet the requirements of the equal rights amendment. Singer v. Hara, supra.

There is another aspect of Const. art. 31 which is not mentioned by either party, is not referred to in any case involving the equal rights amendment, and is not the subject of any article or comment. There are 16 states which have some kind of equal rights provisions in their constitutions. See 65 Cal. L. Rev. 1086 at 1111–12 (1977), supra. In only one does the word "responsibility" appear—the Constitution of the State of Washington.

The legislative history is scanty. The phrase "and responsibility" was placed in the proposed equal rights amendment by the House committee and was approved apparently without question by the legislature and by the people. Although no reference to the phrase "and responsibility" is made anywhere, we must presume the legislature

and the people did not intend the phrase to be mere surplusage but that it was to have meaning. *Chlopeck Fish Co. v. Seattle*, 64 Wash. 315, 117 P. 232 (1911).

■ The most obvious and we belive correct meaning is on the face of the amendment: "Equality of . . . responsibility under the law shall not be denied or abridged on account of sex." The "Equality of . . . responsibility under the law" involved here is for each sex equally to conduct the affairs of major political parties through the statutory instrumentalities required by RCW 29.42.020 and .030—the state committees. This is an equal responsibility mandated by law and which, under the equal rights amendment, "shall not be denied or abridged on account of sex." When the state, by statute, mandates an equality of responsibility, it is hardly appropriate for this court to hold this statutory mandate to be stricken by the very constitutional provisions which approve it. Neither RCW 29.42.020 nor RCW 29.42.030 violate Const. art. 31, the equal rights amendment.

## II
### RIGHT OF ASSOCIATION

Plaintiffs cite the first amendment to the United States Constitution and Const. art. 1, § 4 and assert RCW 29.42-.020, which specifies the size and geographical composition of the State Democratic Committee, unconstitutionally violates their right to freedom of association.

Freedom of association is a distinct right under the federal constitution and was first discussed in *NAACP v. Alabama*, 357 U.S. 449, 2 L. Ed. 2d 1488, 78 S. Ct. 1163 (1958) (per Harlan, J.). A number of recent cases dealing with the affairs of political parties and which refer to political associational rights are brought to our attention by plaintiffs: *Buckley v. Valeo*, 424 U.S. 1, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976); *Cousins v. Wigoda*, 419 U.S. 477, 42 L. Ed. 2d 595, 95 S. Ct. 541 (1975); *Kusper v. Pontikes*, 414 U.S. 51, 38 L. Ed. 2d 260, 94 S. Ct. 303 (1973); *Ripon Soc'y, Inc. v. National Republican Party*, 525 F.2d 567 (D.C. Cir.

1975), *cert. denied*, 424 U.S. 933, 47 L. Ed. 2d 341, 96 S. Ct. 1147 (1976); *Fahey v. Darigan*, 405 F. Supp. 1386 (D.R.I. 1975).

■■ In *Storer v. Brown*, 415 U.S. 724, 729, 39 L. Ed. 2d 714, 94 S. Ct. 1274 (1974), the court stated, "substantial burdens on the right to vote or to associate for political purposes are constitutionally suspect and invalid under the First and Fourteenth Amendments and under the Equal Protection Clause unless essential to serve a compelling state interest." While the defendants have the burden to show a compelling state interest, proof of a substantial burden on the right to associate for political purposes is a prerequisite to finding a violation of plaintiffs' associational rights. This burden of proof is on the plaintiffs. *American Party v. White*, 415 U.S. 767, 790, 39 L. Ed. 2d 744, 94 S. Ct. 1296 (1974); *Fahey v. Darigan, supra*. Thus, we must first inquire as to whether plaintiffs have shown a substantial burden on their association for political purposes.

Plaintiffs cite *Cousins v. Wigoda, supra; Ripon Soc'y, Inc. v. National Republican Party, supra;* and *Fahey v. Darigan, supra*, as authority for their assertion that the regulation of the size and composition of the State Democratic Committee is a substantial burden on them as members of the Democratic Party. However, neither *Cousins* nor *Ripon* deals directly with this point. They are concerned with the electoral process. Only *Fahey v. Darigan, supra*, of all the cases examined by us or brought to our attention by plaintiffs directly concerns the membership of political party governing bodies. No case of the United States Supreme Court has extended the right of association in political affairs to areas outside of racial discrimination or participation in the electoral process. Furthermore, there seems to be little inclination to expand the doctrine to other aspects of the political process. As *Storer v. Brown, supra* at 730 states, "It is very unlikely that all or even a large portion of the state election laws would fail to pass muster under our cases". We believe *Fahey v. Darigan, supra*, to be an aberration from the rules and principles

announced by the United States Supreme Court and find it not controlling in this case. Furthermore, in *Fahey,* one faction of the Democratic Party used its political muscle in the Rhode Island legislature to overturn, for its own advantage, long–standing intraparty organizational arrangements. Here the statute complained of has been in effect since 1927—over 50 years—and the statute containing the principle complained of has been in effect since 1909—nearly 70 years.

More importantly, however, we must consider whether the associational rights of members of the Democratic Party have in fact been substantially burdened by RCW 29.42.020. There is no question but that RCW 29.42.020 mandates the size and composition of the State Democratic Committee. But the focus of the question of substantial burden, contrary to the position of plaintiffs, is not to the composition of the state committee and the ability of persons to be members of that committee. This is too narrow a view. Rather, it is to whether the requirements of RCW 29.42.020 place a substantial burden on plaintiffs as they seek to achieve the stated purposes and objectives of the Democratic Party.

At this point, it is useful to give an account of some of the activities of the 1976 State Democratic Convention. At this convention, held in Olympia on June 12, 1976, a "Charter of the Democratic Party of Washington" was adopted by the delegates. Included in this charter were articles dealing with purpose and objectives, membership, organizations or officials authorized to function continuously, convening of party organizations, basic principles and specific party practices.

The purpose and objectives of the Democratic Party as listed by the charter are:

1. Adopt and promote statements of policy to serve as standards for Democratic elected officials and goals for the people of the state.

2. Nominate and assist in the election of Democratic candidates at all levels who support the goals of the party.
3. Administer the party organization in accordance with rules and standards which will facilitate achieving the goals of the party.
4. Establish standards and rules of procedure to afford all members of the Democratic Party full, timely and equal opportunities to participate in decisions concerning the selection of candidates, the formulation of policy, and the conduct of other party affairs without discrimination on the basis of sex, race, age (except where state and federal law precludes participation), religion, economic status or ethnic origin.
5. Promote fair campaign practices and fair adjudication of disputes.
6. Raise and disburse monies needed for the continuing operation of the Party.
7. Work with elected Democratic public officials at all levels to achieve the goals of the Democratic Party.
8. Encourage and support codes of political ethics governing all public officials in the conduct of their offices.
9. Encourage voter registration and voting.

Charter of the Democratic Party of Washington, art. 2, Purposes and Objectives (June 12, 1976).

The associational rights of plaintiffs as members of the Democratic Party of Washington are those which flow from the declared purposes and objectives of the party articulated on June 12, 1976, and contained in article 2 of the charter. Plaintiffs have failed to indicate in any way how these purposes and objectives will be in the least burdened by RCW 29.42.020. In article 6 of the charter, the "Basic Principles" of the Democratic Party of Washington are listed. They are: Open Party; Full Participation; Fair Representation; Majority Rule; and Accountability. The definition of these terms is also contained in article 6. The furtherance of these basic principles presumably is a goal of the party. However, there is no principle the fulfillment by plaintiffs of which is on its face—or by argument of plaintiffs—substantially burdened by RCW 29.42.020.

Finally, it should be noted that there is no associational burden of any kind, other than the required voter registration, on the right and ability of any Democrat to vote indirectly (by voting for Democratic precinct committee members in the general election) or directly (as a precinct committee member) for members of the state committee. Plaintiffs have failed to meet their burden of proof. We hold RCW 29.42.020 is not a substantial burden on plaintiffs' right of free association for political purposes.

This case is another in a series of cases going back nearly a decade relating to intraparty struggles within the two major political parties in this state. *Maxey v. Washington State Democratic Comm.*, 319 F. Supp. 673 (W.D. Wash. 1970); *Dahl v. Republican State Comm.*, 319 F. Supp. 682 (W.D. Wash. 1970); *King County Republican Cent. Comm. v. Republican State Comm.*, 79 Wn.2d 202, 484 P.2d 387 (1971). It involves neither matters of racial discrimination, nor the electoral process, nor the freedom of any Democrat to participate fully in the affairs of his or her party. While plaintiffs bring the case to us alleging constitutional deficiencies and assert it is part of the "national movement toward increased democratization of American political parties", it is in reality a factional dispute within the Democratic Party which, rather than being resolved through the usual and appropriate political processes, has been thrust into the judicial arena. While we do not deny the parties' right to a judicial determination of this dispute, we share the views expressed by the court in *Fahey v. Darigan, supra* at 1398 n.12, "[T]he party factions should have resolved their differences by intraparty politicking, as is ordinarily and properly the case."

### III
### AUTHORITY OF THE STATE DEMOCRATIC CONVENTION

The final matter to be determined is whether the trial court properly held, but for the exceptions noted in I and II above, that the charter, except for article 4(G)(4) is binding on the State Democratic Committee. According to affidavits

submitted to the trial court, the chairman of the State Democratic Committee, Neale V. Chaney, ruled at a meeting of the committee on January 29, 1977, that the state committee was not operating under the charter. A motion to adopt the charter without article 4(G)(4) was defeated at the April 16, 1977, meeting of the committee.

■ Plaintiffs urge that our views expressed in *King County Republican Cent. Comm. v. Republican State Comm., supra* at 211–12, apply here. We agree. As stated in that case:

> [I]t is clear under general law that on a statewide basis the state convention of a major political party is the ultimate repository of statewide party authority. As is generally true with the deliberative bodies of voluntary associations, the state political party convention possesses the intrinsic power to determine the number, manner of selection, and the qualifications of its members. And, subject to the intervention of applicable statutory or constitutional provisions, the state convention is implicitly empowered to establish the permanent state organization of the party, create committees, delegate authority, and promulgate, adopt, ratify, amend, repeal or enforce intraparty statewide rules and regulations. 25 Am. Jur. 2d *Elections* §§ 120, 121 (1966); 29 C.J.S. *Elections* §§ 83, 84 (1965).

Here, the trial court in its order and judgment stated:

> That the State Convention of the Washington State Democratic Party is the ultimate repository of statewide party authority, that the Washington State Democratic Committee is subject to the overriding authority of State Convention, that the Charter of the Washington State Democratic Party was duly adopted by the Washington State Democratic Convention on June 12, 1976, that the Charter is binding on the State Democratic Committee.

The trial court specifically refused to order that "the State Democratic Committee must be operated in accordance with the Charter." We concur with the trial court's views. While under the authority of *King County Republican Cent. Comm. v. Republican State Comm., supra,* the state convention is the ultimate repository of statewide

party authority, it may well be that portions of the State Democratic Charter not before us for consideration violate state or federal statutes and constitutions. Thus, while the action of the state convention is binding on the State Democratic Committee except for article 4(G)(4), we do not at this time pass on the validity of the rest of the charter as it relates to the state and federal laws and constitutions.

The judgment of the trial court as to the applicability of Const. art. 31 to RCW 29.42.020 and .030 and the applicability of the right of association under the state and federal constitutions to RCW 29.42.020 is reversed. With the exception of article 4(G)(4), the judgment that the State Democratic Charter is binding on the Democratic State Committee is affirmed.

ROSELLINI, HAMILTON, BRACHTENBACH, and HICKS, JJ., concur.

HOROWITZ, J. (dissenting)—The majority opinion denies the State Democratic Party the right to control the size and composition of its own state committee, the body charged with governing the statewide operations of the party between conventions, through the means of a charter duly adopted by the party's own convention. First, the majority holds sex is to be a criterion for membership on the committee, despite the party members' expressed will that ability—not sex—be the relevant criterion, and despite the mandate of the people of Washington, expressed in their adoption of the equal rights amendment to our state constitution, that sex not be a criterion in creating classifications affecting rights and responsibilities.

Second, the majority holds that the party may not alter the composition of the committee to more fairly represent the Democrats of the three most populous counties of the state. King, Pierce, and Spokane Counties comprise approximately 52 percent of the state's total population,[1]

---

[1] Based on 1976 population figures. State of Washington, Office of Program Planning and Fiscal Management, *State of Washington Pocket Data Book.*

and approximately 53 percent of the total number of its registered voters.[2] Yet Democrats from these counties are represented by only 8 percent of the delegates to the state committee. Despite the clear and substantial burden this inequity places on the right of free association of Democratic Party members, and despite this court's recent decision in *King County Republican Cent. Comm. v. Republican State Comm.,* 79 Wn.2d 202, 484 P.2d 387 (1971) (hereinafter referred to as *King Cy. Rep. Comm.*) that the party convention controls party government, the majority stymies the effort of the state party, made at its convention, to remove the inequity by imposing a new formula and giving the three most populous counties 27 percent of the total number of delegates.

In reaching its result, the majority has seriously undermined the strength of the equal rights amendment and of the First Amendment freedom of association to promote political views. Furthermore, it has ignored our holding that the state convention is the "ultimate repository of statewide party authority," superior to the state committee. *King Cy. Rep. Comm., supra* at 211, 212. I cannot believe this result is legally sound.

I
## The Equal Rights Amendment

The equal rights amendment adopted by the people of the State of Washington in 1972 (Const. art. 31, § 1) absolutely forbids any classification of persons based on sex. *Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975). The majority concedes the amendment's broad language is not to be construed under the judicial standards adopted by the United States Supreme Court for the equal protection clause of the Fourteenth Amendment, which permit classifications based on sex where the requirements of the rational relationship or strict scrutiny test have been met. Moreover, the majority correctly points out that the thrust

---

[2]Based on official returns of November 1976 general election.

of the equal rights amendment is to end discrimination against either sex. The majority wrongly concludes, however, that the equality of rights and responsibilities guaranteed by the amendment is the same as equality of numbers, an interpretation which is obviously at odds with both the language and the spirit of the amendment. Equality of the *right* to seek and hold party offices cannot be guaranteed when these offices are to be allocated on the basis of sex so as to achieve equality of *numbers*. Furthermore, the majority approves, and thereby perpetuates, the use of sex as a criterion for classification, the very evil sought to be eliminated by the amendment.

In *Darrin v. Gould, supra,* this court adopted a standard for application of the new constitutional amendment, namely, outright prohibition of classifications on the basis of sex, even where such a classification would have been permissible under the equal protection clause. *All* classifications based on sex are prohibited. The only exceptions, we pointed out, are where the function of the classification is to regulate cohabitation in sexual activity between unmarried persons, protect fundamental rights of privacy, or allow dissimilar treatment because of characteristics unique to one sex. *Darrin v. Gould, supra* at 872 n.8. The majority even quotes the rationale adopted for this far–reaching standard: that the equal rights amendment must have been intended to prohibit sex classifications allowable under other constitutional provisions. The majority fails to state the rule adopted in *Darrin v. Gould,* though, that is that a classification cannot be based on sex alone, with no relation to the individuals' ability to perform the activity regulated. In *Darrin* the activity regulated was participation in high school football, and we held that, under the facts of that case, a classification based on sex did not relate to the ability of the individual to play football. Here the activity regulated is representation of a constituency on the Democratic Party's county or state committees. It should be obvious that sex is completely unrelated to the

ability of an individual to perform these duties. This classification based on sex is also prohibited by the equal rights amendment.

The majority argues, however, that RCW 29.42.020 and .030, which require delegations to the state committee to consist of one man and one woman from each county, and that the chairman and vice–chairman of the state and county committees be of opposite sexes, breathe the *spirit* of equality and therefore conform to the requirements of the equal rights amendment. The error in this argument is easily demonstrated. The sex–related provisions of the statues have the effect that once a woman is chosen to represent her county on the state committee, or to be chairman or vice–chairman of one of the committees, no other woman is eligible for the remaining position, even though she may be the best qualified candidate and the person who would receive the most votes in a free election. A man must be chosen, even though that man may not possess the same qualities. All women desiring to seek and hold the remaining office are denied the right to do so *merely because of their sex*. Obviously, the same inequity applies to men seeking office under these statutes. Furthermore, contrary to the assertion of the majority, this inequity would exist, and be equally repulsive to the equal rights amendment, even if the statutory language required "an equal number of women and men." Clearly the majority opinion prevents the equal rights amendment from achieving its purpose of making sex a neutral factor, one to be disregarded in favor of ability and performance.

The majority argues that the use of the word "responsibility" in the amendment is ignored by this interpretation. On the contrary, the use of the word "responsibility" in the amendment emphasizes its aim that appropriate criteria, such as excellence in the activity regulated, be applied in creating necessary classifications, instead of the inappropriate criterion of sex. Talent is to be the guide, not sex.

I believe the equal rights amendment was intended to aid a political party, including the Democratic Party, in its

effort to set ability as the criterion for election of its officials, not to hamstring it. The majority's interpretation distorts the amendment's very purpose. The Democratic Party in convention assembled decided the welfare of the party would be best served by the use of criterion of ability, rather than sex, in choosing its officials. It is supported in its effort to employ that criterion by the language and spirit of the equal rights amendment. The majority's distortion of the amendment stymies the efforts of both the Democratic Party and the people of Washington to make sex a completely neutral factor in the creation of classifications affecting rights and responsibilities in this state.

## II
### RIGHT OF ASSOCIATION

The majority holds that respondents failed to show the statute determining the size and composition of the Democratic State Committee places a substantial burden on their freedom of association for political purposes under the First Amendment. This "factional dispute within the Democratic Party," it holds, should be resolved by "intraparty politicking." The majority appears to ignore rather than acknowledge the political reality facing the State Democratic Party, and to substitute its own judgment of what control over party structure is needed for that of the party convention, and of at least two federal courts.

The state committee as constituted by RCW 29.42.020 is grossly underrepresentative of the Democratic Party members living in the state's three most populous counties. Respondents point out in their brief, and appellants do not deny, that the vote of one Democrat in Garfield County has an influence in the state committee equal to the votes of nearly 400 Democrats in King County. The result is the party's principal organ for pursuing its political goals does not fairly represent the party's membership. Too great a voice is given to members from less populous areas; too small a voice is given to members from populous urban areas. Yet this committee has enormous control over the

functioning of the State Democratic Party, and the majority's opinion gives it the additional power to ignore the mandate of the party's own convention.

The party decided at its convention that the inequitable makeup of the state committee burdened its ability to pursue the party's political goals and adopted a charter which alters the formula for the composition of the state committee. The party took the very course recommended by the majority. Through "intraparty politicking" at the convention, it arrived at a formula for allocating responsibility for governing the party which it felt was democratic and fair. It now seeks to put that formula into effect, but is prevented from doing so by the statute here challenged.

Respondents claim this situation is a burden on their right of association, and they have federal precedent to support their claim. The majority errs when it labels *Fahey v. Darigan*, 405 F. Supp. 1386 (D.R.I. 1975) an "aberration." The reasoning of that case, which held that freedom of association of members of a political party prohibits state regulation of the size of internal party organs, is entirely consistent with the United States Supreme Court holding in *Cousins v. Wigoda*, 419 U.S. 477, 42 L. Ed. 2d 595, 95 S. Ct. 541 (1975). That case held that state interference with party rules governing qualification of delegates to a national convention unconstitutionally burdens party members' right of association. Although the court emphasized the crucial nature of the election for president and vice–president involved in *Cousins*, the notion that a political party must have control of its own processes was not limited in that case to national presidential elections. Furthermore, *Fahey v. Darigan* is not the only lower court case upon which respondents can rely. In *Ripon Soc'y, Inc. v. National Republican Party*, 525 F.2d 567 (D.C. Cir. 1975), *cert. denied*, 424 U.S. 933, 47 L. Ed. 2d 341, 96 S. Ct. 1147 (1976), the court stated a conclusion fairly drawn from Supreme Court precedents:

What is important for our purposes is that a party's choice, as among various ways of governing itself, of the

one which seems best calculated to strengthen the party and advance its interest, deserves the *protection* of the Constitution as much if not more than its condemnation. The express constitutional rights of speech and assembly are of slight value indeed if they do not carry with them a concomitant right of political association. Speeches and assemblies are after all not ends in themselves but means to effect change through the political process. If that is so, there must be a right not only to form political associations but to organize and direct them in the way that will make them most effective.

*Ripon Soc'y, Inc. v. National Republican Party, supra* at 585.

This court took note of the importance of party organization to freedom of speech in *King Cy. Rep. Comm., supra* at 219 and *State ex rel. Wells v. Dykeman,* 70 Wash. 599, 127 P. 218 (1912). With this wealth of sound precedent supporting respondents' claim that their freedom of association is substantially burdened by the statute they challenge, it is insupportable for the majority to characterize *Fahey v. Darigan* as an "aberration." That case is direct support for respondents' convincing argument that their freedom of association is burdened by the statute, which deprives them and other party members of the right to democratically organize their principal party organ as they see fit.

Furthermore, while the majority claims respondents have failed to indicate in any way how the purposes and objectives of the Democratic Party will be burdened by the statute, it ignores one of the very purposes and objectives it quotes from the charter:

> 3. Administer the party organization in accordance with rules and standards which will facilitate achieving the goals of the party.

Charter of the Democratic Party of Washington, art. 2, Purposes and Objectives (June 12, 1976). The charter could not be more explicit in stating a purpose to govern the

party in such a way as to most effectively pursue its political goals. The interference of the statute with this purpose is patently obvious.

Respondents having established this substantial burden on their First Amendment rights, it becomes appellants' burden to show a compelling state interest justifying the statute's interference in internal party organization. *Cousins v. Wigoda, supra.* Appellants must also show the State has chosen the least restrictive means to achieve its purpose. *See Kusper v. Pontikes,* 414 U.S. 51, 38 L. Ed. 2d 260, 94 S. Ct. 303 (1973). The appellants have failed to carry the burden and the statute should be found unconstitutional.

## III
### AUTHORITY OF THE STATE DEMOCRATIC CONVENTION

The majority reaffirms the holding of this court in *King Cy. Rep. Comm., supra,* that "the state convention of a major political party is the ultimate repository of statewide party authority." It holds the action of the state convention is binding on the state committee. Nonetheless, the majority holds the formula for adding delegates to the state committee provided in article 4(G)(4) of the charter is not binding on the committee. While the rationale of the majority is not explicit, it may be inferred that it bases its conclusion on the proviso to the statement made in the *King Cy.* case, that is, "*subject to the intervention of applicable statutory . . . provisions,* the state convention is implicitly empowered to establish the permanent state organization of the party". *King Cy. Rep. Comm., supra* at 211. (Italics mine.) This assumes, of course, that an applicable statute is valid.

The majority thus ignores the real issue created by the conflict between the charter formula and the statutory formula for the composition of the state committee. As a matter of statutory construction, does RCW 29.42.020 empower the state committee to disregard the mandate of the party convention to seat additional committee members elected pursuant to the charter? In *King Cy. Rep. Comm., supra,*

we said the state committee is subordinate to the overriding power of the convention. Our own precedent thus supports the action of the party convention in creating additional committee seats. In view of our holding in *King Cy. Rep. Comm.*, and of the expressed will of the party convention, RCW 29.42.020 is an unjustifiable interference with party control over its internal affairs. It violates the First Amendment right of association and is invalid. It must yield to the provisions of the party charter.

The party convention has expressed its choice for the composition of the state committee. Accordingly, for the reasons previously stated, the state committee is bound by its party's convention to seat the additional committee members.

I dissent.

WRIGHT, C.J., and UTTER, J., concur with HOROWITZ, J.

STAFFORD, J. (concurring in the dissent)—I concur in the dissent except insofar as it appears to elevate footnote 8 in *Darrin v. Gould*, 85 Wn.2d 859, 872, 540 P.2d 882 (1975) to the status of a *holding*. In the footnote we merely commented that "three *possible* exceptions" to the federal equal rights amendment were discussed in Brown, Emerson, Falk & Freedman, *The Equal Rights Amendment: A Constitutional Basis of Equal Rights for Women,* 80 Yale L.J. 871, 904 (1971). (Italics mine.) We did not hold that there were in fact three exceptions to the absolute ban of classifications based upon sex under the equal rights amendment (Const. art. 31, § 1). Further, none of the three *possible* exceptions applied in *Darrin v. Gould, supra,* and none apply here. Thus, we should follow the lead of *Darrin* and again refrain from deciding either whether such exceptions exist or whether they are absolutes, until the issue is properly before us.