[No. 6573–1. Division One. September 10, 1979.]

BRUCE MacLEAN, *Appellant,* v. FIRST NORTHWEST
INDUSTRIES OF AMERICA, INC., ET AL,
*Respondents.*

*Bendich, Stobaugh & Strong* and *Judith E. Bendich*, for appellant.

*Douglas N. Jewett, City Attorney, Charles D. Brown, Assistant, Culp, Dwyer, Guterson & Grader, William L. Dwyer,* and *Mark P. Worcester*, for respondents.

DORE, J.—This is a class action for damages brought against the Sonic organization alleging that their "Ladies' Night" price ticketing practice constituted sex discrimination prohibited by the law against discrimination (RCW 49.60), and the state constitution (article 31, the Equal Rights Amendment (ERA)). Plaintiffs appeal the summary judgment of dismissal. We reverse and remand.

## ISSUES

1. Do "Ladies' Nights" that occur every third game during the Sonics' home stand throughout the season, wherein tickets are sold to women at one-half the price of tickets for men, constitute sex discrimination?

2. If the refusal to sell a basketball ticket to a man for the same price as a woman constitutes sex discrimination, is it prohibited by law, constitutional, statutory, or both?

3. Whether the trial court erred in granting summary judgment dismissing plaintiff's class action.

## FACTS

On Sunday, November 28, 1976, plaintiff MacLean, his spouse and another couple, attended a Supersonics basketball game at Seattle Center Coliseum. MacLean purchased tickets for the four. He requested to pay the same admission price for himself and the other male as that paid by female spectators at the "Ladies' Night" Supersonics basketball game. The ticket seller refused to sell MacLean tickets for the males at the 50 percent discount rate charged female spectators for the same class of seats despite MacLean's complaint to the seller that the price constituted discrimination solely on account of his sex. MacLean then purchased two tickets at the reduced price for ladies and paid the full price or twice that amount for himself and a friend. Had he not paid the higher price for males, he would not have been permitted to attend the basketball game.

MacLean then filed this class action complaint against the defendants for damages, injunctive relief and costs under RCW 49.60, the law against discrimination, and the Consumer Protection Act, RCW 19.86.020. The defendants designated in the complaint are First Northwest Industries, Inc. (hereinafter designated FNI), and the City of Seattle (hereinafter designated City). FNI operates the Seattle Supersonics and is primarily responsible for setting ticket prices for its basketball games and, at that time, leased the Coliseum from the City of Seattle and established Sunday "Ladies' Night" basketball games 10 years ago. The City of Seattle owns and maintains the Seattle Coliseum for public events. It is a public–owned facility for public accommodation assemblies and amusement.

The lease between FNI and the City, among other things, provides "That said Lessee will comply with all laws of the United States, and of the State of Washington . . ."

The Lessee agrees to comply with all state and local laws prohibiting discrimination with regard to race, color, creed, sex, age or national origin.

. . .

Failure to comply with any of the terms of this provision shall be a material breach of this lease.

Zollie M. Volchok, the executive vice–president of FNI, in his first–party affidavit, stated in reference to "Ladies' Night":

The ladies' night discount has been a part of the team's promotional effort for ten years. It was obvious when we entered the league that a disproportionately low number of women were attending NBA basketball games. In the hope of attracting women fans, and also of making it easier for families to attend, the SuperSonics inaugurated ladies' night by offering half–price tickets to women for all games played on week nights. A survey which we took showed that only about 35% of the team's attendance was composed of women. It appeared necessary to continue with ladies' night and we did so, although the day of the week was changed to Sunday at the beginning of the 1971–72 season. Between 1968 and 1975 the Sonics made all tickets except those in the top price bracket available to women at half–price on ladies' night. The policy was enlarged at the beginning of the current season (1976–77) to include the availability of half–price tickets in all categories, including the top price.

On motion for reconsideration, the plaintiff moved to amend his complaint by pleading that defendant also violated article 31 of the state constitution, known as the Equal Rights Amendment. This request was denied. However, this court sua sponte can always consider constitutional issues, and does so here.

## Decision

Issues 1 and 2: Half–price ladies' basketball tickets constitute sex discrimination and violate RCW 49.60 and the ERA to state constitution (article 31).

■ The trial court granted the defendants an order of dismissal pursuant to summary judgment. In such instance the moving party, defendants herein, must prove by uncontroverted facts that there is no genuine issue of material fact. The nonmoving party is entitled to all reasonable inference from the facts. *Jacobsen v. State*, 89 Wn.2d 104, 108–09, 569 P.2d 1152 (1977).

The plaintiffs contend there are at least two main issues of material fact that cannot be resolved by summary judgment (1) whether FNI's practice of charging women less than men for admission constitutes sex discrimination, and (2) whether the City's lease of a public facility to FNI constitutes state action for the purpose of plaintiff's constitutional claims. We disagree with plaintiff. We hold that the material facts in the record before us, and all inferences from them, are undisputed, and the issues of "state action" and "sex discrimination" can be resolved as a matter of law.

## State Action and the ERA

■ The Equal Rights Amendment, Const. art. 31, § 1, provides "Equality of rights and responsibility under the law shall not be denied or abridged on account of sex." Under this provision discrimination by an action of the State on account of sex is forbidden. *Darrin v. Gould*, 85 Wn.2d 859, 540 P.2d 882 (1975). In *Darrin v. Gould, supra*, it was held that the Washington Interscholastic Activities Association (WIAA) rule prohibiting girls from participating in high school football constituted state action and was prohibited by the ERA. Thus the initial question is whether the ERA applies here where the only state action is the leasing by the City of Seattle of a public facility to a private corporation. We are guided in this inquiry by an examination of federal cases which sought to determine, in

a similar context, whether a state or local government had so participated in the discrimination that it had violated the fourteenth amendment to the United States Constitution. If there is no state action present, we can summarily drop any and all alleged constitutional contentions. When a municipality leases its property, it is engaged in state action. When the private lessee discriminates against patrons on the basis of an immutable trait, the question of state action and state liability becomes a question of fact to determine

> whether conduct which is formally private is so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations on state action . . .

Attorney General Opinion, June 20, 1966, explaining *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961).

*Burton* arose in the context of race, an immutable trait and a suspect classification under traditional equal protection analysis. In *Burton,* a private restaurant leased space from a parking garage owned and operated by the Wilmington Parking Authority. The restaurant refused to serve William Burton solely because of his race. Burton instituted suit for declaratory and injunctive relief under the equal protection clause of the Fourteenth Amendment. The state court granted the restaurant's and the Authority's motions for summary judgment on the grounds that the lessee, in the conduct of its business, was acting in a purely private capacity and therefore no state action existed under the Fourteenth Amendment.

The Supreme Court strongly disagreed. "State action" existed based on factual considerations such as the financial interdependence between the lessee and the Authority and the mutual obligations under the terms of the leasehold. The court stated at page 724:

> Addition of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant

is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn.

*Burton v. Wilmington Parking Authority, supra* at 724.

The court ruled that the good faith belief by either the Authority or the lessee could not excuse the discrimination.

It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith . . . . By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination.

*Burton v. Wilmington Parking Authority, supra* at 725.

*Burton* arose in regard to race discrimination. The doctrine has been applied to sex discrimination. *Seidenberg v. McSorleys' Old Ale House, Inc.,* 317 F. Supp. 593 (S.D.N.Y. 1970) (state action found by issuance of a liquor license to a place of public accommodation); *accord, Bennett v. Dyer's Chop House, Inc.,* 350 F. Supp. 153 (N.D. Ohio 1972).

The facts in the subject case lead to the conclusion that state action pervades the sex discriminatory policies carried out by FNI. This case is much stronger factually than *Burton.* By ordinance, FNI agreed "to comply with all state and local laws prohibiting discrimination with regard to race, color, creed, sex, age, or national origin." Ordinance No. 103025, at 14; *see also* Addendum I to lease, at 2. By ordinance FNI must comply with all laws of the United States and the State of Washington and

[I]f the attention of the Lessee is called to any such violation on the part of Lessee or by any person employed by or admitted to the said premises, such Lessee will immediately desist from and correct such violation . . .

Ordinance, at 6.

FNI has openly carried on its policy for profit for 10 years, oblivious to and in disregard of the changes in law and policy commanded by the voters, the legislature and the courts. Despite its responsibilities as guardian of all its

citizens and its power under its own ordinance, the City of Seattle did nothing in the face of sex discrimination by its lessee with the *excuse that it only collects taxes.*

■ We next must determine whether there has been a violation of the ERA. In *Darrin v. Gould, supra,* our Supreme Court held that where a school district, operating a high school in this state, denied two of its fully qualified high school students permission to play on the high school football team in interscholastic competition solely on the ground the students were girls, the denial was prohibited discrimination based on sex. The court reasoned at page 871:

> When the Darrin girls were denied permission to play in the fall of 1973, Const. art. 31, § 1, Washington's Equal Rights Amendment provided:
>> Equality of rights and responsibility under the law *shall not* be denied or abridged on account of sex.
>
> (Italics ours.)
> Const. art. 31, provided the latest expression of the constitutional law of the state, dealing with sex discrimination, as adopted by the people themselves. Presumably the people in adopting Const. art. 31 intended to do more than repeat what was already contained in the otherwise governing constitutional provisions, federal and state, by which discrimination based on sex was permissible under the rational relationship and strict scrutiny tests. Any other view would mean the people intended to accomplish no change in the existing constitutional law governing sex discrimination, except possibly to make the validity of a classification based on sex come within the suspect class under Const. art. 1, § 12. *See* footnote 7, *supra.* Had such a limited purpose been intended, there would have been no necessity to resort to the broad, sweeping, mandatory language of the Equal Rights Amendment. *See* Comment, *Sex Discrimination in Interscholastic High School Athletics,* 25 Syracuse L. Rev. 535, 570–74 (1974).

*Darrin v. Gould, supra* at 871.

Justice Hamilton, concurring with three other justices of the court in *Darrin,* made the interesting observation:

With some qualms I concur in the result reached by the majority. I do so, however, exclusively upon the basis that the result is dictated by the broad and mandatory language of Const. art. 31, § 1, Washington's Equal Rights Amendment (ERA). Whether the people in enacting the ERA fully contemplated and appreciated the result here reached, coupled with its prospective variations, may be questionable. Nevertheless, in sweeping language they embedded the principle of the ERA in our constitution, and it is beyond the authority of this court to modify the people's will. So be it.

*Darrin v. Gould, supra* at 878.

In New York, the New York Yankees offered discount prices for women at "Ladies' Day" baseball games at Yankee Stadium. This price was held to be sex discrimination and prohibited by the New York State Human Rights Appeal Board under the New York Statute, Exec. Law § 296.2, *Abosh v. New York Yankees, Inc.,* No. CPS–25284, Appeal No. 1194 (N.Y. State Human Rights Appeal Board, July 19, 1972).

The court in holding sex discrimination under the New York Statute, reasoned:

It would further appear that the statutory criterion on sex is extensive to both men and women and that it accords no preferential treatment or privileges to women over men.

. . .

The record further shows that at the Conference held at the Division on November 4, 1971, respondents argued that "Ladies Day" also encouraged "the women of the United States to build stronger bonds with the male members of their families" and that "Baseball is a family sport—a sort of Mom and Pop deal."

Respondents' argument, although praiseworthy, is untenable in that it presupposes intact families where every woman has a man to take care of her. Unfortunately, that is not the case in America today, where 11.5% of all families are headed by women and where 40% of all working women are either single, divorced, deserted, widowed, separated or abandoned.

. . .

Perhaps, in their unending quest to serve best the social interests of the public, a Community Day at reduced prices irrespective of sex, rather than a Ladies Day with its attendant pricing based on sex, might well accomplish respondents' social concerns without violating the public policy of this State as embodied in the sex prohibition of Section 296.2.

*Abosh v. New York Yankees, supra.*

In *Marchioro v. Chaney,* 90 Wn.2d 298, 582 P.2d 487 (1978), the court in upholding the state statute governing the administration of state political committees, in reference to the Equal Rights Amendment, quoting from *Darrin v. Gould, supra,* stated at page 305:

Under the equal rights amendment, the equal protection/suspect classification test is replaced by the single criterion: *Is the classification by sex discriminatory? or, in the language of the amendment, Has equality been denied or abridged on account of sex?* In the language of *Darrin v. Gould* at page 877, "under our ERA *discrimination* on account of sex is forbidden." (Italics ours.) *See Singer v. Hara,* 11 Wn. App. 247, 257, 522 P.2d 1187 (1974).

The thrust of the equal rights amendment (*see, e.g.,* 80 Yale L.J. 871 (1971), *supra;* Comment, *Equal Rights Provisions: The Experience Under State Constitutions,* 65 Cal. L. Rev. 1086 (1977)), is to end special treatment for or discrimination against either sex.

(Some italics ours.)

In *Orr v. Orr,* 440 U.S. 268, 59 L. Ed. 2d 306, 99 S. Ct. 1102 (1979), the court struck down an Alabama statute which provided that husbands, but not wives, may be required to pay alimony upon divorce. The court held that the gender–based statute discriminated against men in violation of the equal protection clause of the Fourteenth Amendment. At page 283, the court said:

Legislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing stereotypes about the "proper place" of women and their need for special protection. Cf. *United Jewish Organizations v. Carey,* 430 U. S. 144, 173–174

(1977) (concurring opinion). Thus, even statutes purportedly designed to compensate for and ameliorate the effects of past discrimination must be carefully tailored. Where, as here, the State's compensatory and ameliorative purposes are as well served by a gender–neutral classification as one that gender–classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex. And this is doubly so where the choice made by the State appears to redound—if only indirectly—to the benefit of those without need for special solicitude.

We hold that the ticket policy here was discriminatory on the basis of sex. Such discrimination on account of sex is forbidden. *Darrin v. Gould, supra.*

### Sonic Ticket Practice Violates Law Against Discrimination, RCW 49.60

In 1973, the Washington legislature under the police power of the State, comprehensively amended the law against discrimination, RCW 49.60. The law reasserts what history and experience have repeatedly shown, that discrimination on the basis of an immutable trait is harmful to the fabric of our society. RCW 49.60.010 states:

The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of . . . sex . . . are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.

The injustice of the case at bar would readily be recognized as impermissible if it arose in the context of race. It would be inconceivable to have a "Blacks' Night" or a "Whites' Night" or a "Filipinos' Night" at the Seattle Center Coliseum. It would be unsupportable for the City of Seattle to increase its coffers or take in any revenues on the basis of race classifications.

In the instant case, plaintiff's complaint alleged FNI's "Ladies' Night" ticketing practice violated his civil right to be free from sex discrimination by denying him "the full enjoyment of any of the accommodations, advantages,

facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement". RCW 49.60-.030(1)(b). Plaintiff's complaint also alleged a denial of the "equal enjoyment" of such places of public resort, accommodation, etc.

■ When determining the legislative intent, the purpose for which the law was enacted is a matter of prime importance in arriving at a correct interpretation and a thing which is within the object, spirit, and meaning of the statute is as much within the statute as if it were within the letter. *In re Estates of Donnelly*, 81 Wn.2d 430, 502 P.2d 1163, 60 A.L.R.3d 620 (1972). *See also Washington Water Power Co. v. State Human Rights Comm'n*, 91 Wn.2d 62, 586 P.2d 1149 (1978).

The trial court's summary judgment of dismissal of plaintiff's complaint has produced a result inconsistent with the legislature's intent, *i.e.*, the plaintiff has been discriminated against on the basis of sex and has been denied the civil remedy the statute was intended to provide.

RCW 49.60.040 defines "full enjoyment of" as follows:

"Full enjoyment of" includes the right to . . . the admission of any person to . . . facilities . . . of any place of public . . . amusement, without acts directly or indirectly causing persons of any *particular race, creed or color,* to be treated as not welcome, accepted, desired or solicited;

(Italics ours.) The trial judge believed that this specific definition controlled over other possible definitions of "full enjoyment." We refrain from applying a rule of construction which would demand that this court abandon its primary objective when construing statutes; that of construing a statute in a manner consistent with the legislative intent. RCW 49.60.030 was amended in 1973 to extend its protections to discrimination because of sex. Laws of 1973, ch. 141, § 3. Although RCW 49.60.040 was reenacted at that time the legislature did not add the word "sex" to the last portion of the definition of "full enjoyment of." This omission, when read together with the statutory purpose stated

in RCW 49.60.010, raises an ambiguity as to the legislative intent.

■ We find appropriate the rule of statutory construction which provides that if language of a statute is susceptible of two constructions, one of which will carry out and the other defeat the clear objective of the statute, the statute will be construed in such a manner as to carry out its object. *Miller v. Paul Revere Life Ins. Co.*, 81 Wn.2d 302, 501 P.2d 1063 (1972). We believe the interpretation given "full enjoyment" in *Anderson v. Pantages Theatre Co.*, 114 Wash. 24, 194 P. 813 (1921), best carries out the legislative intent.

*Anderson v. Pantages Theatre Co., supra,* involved a civil action against a theater for discrimination for violation of a criminal statute. The statute stated at page 27:

"Every person who shall deny to any other person because of race, creed or color, the *full enjoyment* of any of the accommodations, advantages, facilities or privileges of any place of public resort, accommodation, assemblage or amusement, shall be guilty of a misdemeanor."

(Italics ours.)

The court then interpreted not only the form and effect of the statute but also the right to "full enjoyment."

This statute, while penal in form only, is both penal and remedial in its nature and effect. In addition to providing for a criminal punishment of proprietors of such places for discriminating against the admission thereto of persons on account of race, creed or color, it confers rights upon the individual—*it confers* upon all persons, regardless of their race, creed or color, *the right to be admitted to the places enumerated on equal terms with all others.*

(Italics ours.) *Anderson v. Pantages Theatre Co., supra* at 27–28.

■ We believe the *Anderson* court's interpretation of the right to "full enjoyment" as being the right to be admitted to places of public resort, accommodation, assemblage, or amusement, *on equal terms* with all others is

applicable to the instant case and is consistent with the legislative intent to provide a civil remedy for victims of sex discrimination.

In summary, we conclude (1) that state action exists in the selling of Sonic basketball tickets at the Coliseum, and (2) that Sonic "Ladies' Night" ticket practices constitute sex discrimination under our state's ERA as well as under the law against discrimination, RCW 49.60.

In the future, may we suggest "Spouses' Night" at Sonic basketball games as a vehicle to promote the ladies' attendance.

Attorneys' fees on this appeal shall be allowed in a reasonable amount as determined by the trial court.

Reversed and remanded for further proceedings in accordance with this opinion.

FARRIS, J. (concurring in part)—I concur in reversing the summary judgment of dismissal. This result is compelled by the sixty-first amendment to the Constitution of the State of Washington, the Equal Rights Amendment, Const. art. 31, § 1,[1] as interpreted by the Washington State Supreme Court in *Marchioro v. Chaney,* 90 Wn.2d 298, 582 P.2d 487 (1978) and *Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975).

ANDERSEN, J. (concurring in part)—I agree with Judge Farris and therefore concur in reversing the summary judgment of dismissal.

Reconsideration denied October 25, 1979.

Review granted by Supreme Court February 15, 1980.

---

[1] Approved by a vote of the people of the state of Washington on November 7, 1972.