[No. 46735.   En Banc.   October 29, 1981.]

BRUCE MACLEAN, *Respondent,* v. FIRST NORTHWEST INDUSTRIES OF AMERICA, INC., ET AL, *Petitioners.*

*Culp, Dwyer, Guterson & Grader,* by *William L. Dwyer* and *Karen R. Pederson,* for petitioner First Northwest Industries of America, Inc.

*Douglas N. Jewett, City Attorney,* and *Charles D.*

*Brown, Assistant,* for petitioner City of Seattle.

*Bendich, Stobaugh & Strong* and *Judith E. Bendich,* for respondent.

[As amended by order of the Supreme Court November 25, 1981.]

ROSELLINI, J.—The respondent brought this suit to obtain an injunction and damages for alleged sex discrimination practiced against him by the owners of the Seattle Sonics basketball team. He alleged that he had attended a game at the Seattle Coliseum, taking with him as his guests his wife and two friends, who were also husband and wife. On that night, women were being admitted for one–half the regular ticket price. He chose seats for which the regular price was $5 and asked the ticket attendant to sell him tickets for himself and his male friend, as well as for the two women, at half price. This she refused to do. Choosing to attend the game nevertheless, he paid $15 for the four tickets, $5 each for the men and $2.50 each for the women.

The complaint alleged that the special prices for women violated RCW 49.60.030(1) and was therefore an unfair practice under RCW 19.86.020. It was alleged that the City had condoned and encouraged the practice.

While the petitioner allegedly represented a class of men in the same position as he, the Superior Court did not reach the question whether a class action could be maintained. It dismissed the suit on motion for summary judgment. The motion was made on the pleadings and affidavits submitted by the defendants, with none of the facts contained in the affidavits having been controverted, except with respect to the role of the City of Seattle in the alleged discriminatory practice. The Superior Court concluded that the practice complained of was not within the intended scope of the statutory prohibition.

After the judge ruled on the motion, the respondent moved to amend his complaint to allege a violation of

Const. art. 31, § 1 (amendment 61), the Equal Rights Amendment. This motion was denied. The Court of Appeals took the constitutional question under consideration and held that it had merit. One judge was also of the opinion that the statute was violated. *MacLean v. First Northwest Indus. of America, Inc.*, 24 Wn. App. 161, 600 P.2d 1027 (1979).

Our review of this suit leads us to the conclusion that the disposition made by the trial court was correct, inasmuch as the respondent has shown no discrimination against men as a class and no damage to himself. As a consequence he has no right of action under the state Law Against Discrimination. Further, the court did not abuse its discretion in refusing to allow an amendment of the pleadings to claim a violation of the Equal Rights Amendment.

## I

The affidavit of the vice–president of the organization owning the Sonics was uncontroverted, and he reveals that "ladies' night", as it is sometimes called, is but one of a number of programs employed by the owners to attract more spectators. Admission prices are lower than the regular price for senior citizens, members of the military forces, students, citizens with low incomes, and groups of 30 or more. Occasionally prices are lowered for college students and charities. The half–price admission for women applies only to games played on Sundays.

There can be perceived in this scheme no intent to discriminate against men. They are included in every favored category except for "ladies' night", and undoubtedly predominate in the military category.

The men who are charged the regular prices for their tickets are those who do not fall into any of the special categories. Thus it will be seen that the respondent is not subjected to a classification based solely on sex. If this fact alone is not sufficient to dispel the stigma of sexual bias forbidden by the Law Against Discrimination and the Equal Rights Amendment, examination of the purpose and

effects of the special prices charged women on ladies' night (those women, that is, who are not already entitled to a more favorable discount under some other category) leads to the conclusion that the classification is valid.

According to the affidavit, women do not manifest the same interest in basketball that men do. They constituted only about 35 percent of the gate before special programs, such as ladies' nights, were inaugurated to attract them in larger numbers. The Sunday night discount is not the only attraction offered them. Others include performances by the Seattle Symphony before the game and at half time, women's fashion shows at half time, gifts and souvenirs, and women's hoop shooting at half time.

There is no contention that the regular prices charged for seats at the Sonics games are unreasonable or unfair. It appears that the greater the attendance, the lower the rates that can be charged those who pay the regular price. The high cost of hiring professional basketball teams is well publicized, and we think it safe to assume that to basketball fans, the purchase of the most capable players is money well spent. It is easy to appreciate that large audiences are needed, both to stimulate the players and to raise the money to pay them.

The respondent has been unable to demonstrate that he suffered any damage as a result of this special discount for women. There being no allegation to the contrary, the money which he used to purchase these tickets belonged to the community. All property acquired by either spouse during coverture is presumptively community property and the burden is on a party contending otherwise to prove its separate status.[1] *Rustad v. Rustad,* 61 Wn.2d 176, 377 P.2d 414 (1963). Thus, any reduction in price to one of

---

[1]The respondent has stated that paying less for his wife's ticket made him feel "like her keeper". This is a surprising reaction on the part of one in the respondent's position, bringing a sex discrimination suit. Disregarding the community property laws of this state, and without alleging that he used separate property to make the purchase, the respondent has treated the transaction as though the tickets were bought with funds which belonged exclusively to him.

the members of the community inured equally to the benefit of both. The respondent and his wife, as a community, paid $15 for the four tickets which they purchased, whereas had there been no discount, they would have paid $20. One of the obvious purposes of the discount is to make family attendance cheaper, and that end was achieved here. Thus, not harmed by the price reduction, the respondent enjoyed one of the benefits it was designed to confer. Had he purchased the tickets with his separate funds, the result would not be different. He would still be enjoying a benefit conferred by the reduction in price; and had he taken only himself to the game, the benefit would nevertheless have been available to him to enjoy at his option, had he chosen to take a female friend or relative as his guest.

The practice complained of here is not objectionable under the act. RCW 49.60.030(1)(b) recognizes a right to be free from discrimination because of sex, in the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement. RCW 49.60.040 defines "full enjoyment" as follows:

> "Full enjoyment of" includes the right to purchase any service, commodity, or article of personal property offered or sold on, or by, any establishment to the public, and the admission of any person to accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement, without acts directly or indirectly causing persons of any particular race, creed, color, or with any sensory, mental, or physical handicap, or a blind or deaf person using a trained dog guide, to be treated as not welcome, accepted, desired, or solicited;

Inasmuch as this is the only definition of "full enjoyment" contained in the statute, and since RCW 49.60.030(1)(b) gives the right to full enjoyment of places of public assemblage or amusement, without discrimination on account of sex, we assume that the omission of any reference to sex in the definition of full enjoyment was inadvertent. The language of this section reveals the legislature's concern that

no person should be treated as "not welcome, accepted, desired, or solicited." This provision reflects a perception of the evil which characterizes discrimination in places of public accommodation. The United States Supreme Court in *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961), in holding unconstitutional a policy of refusing service to black customers in a restaurant situated on property leased from the parking authority, had this to say of the discrimination practiced there; a discrimination which it later termed invidious:[2]

> It is irony amounting to grave injustice that in one part of a single building, erected and maintained with public funds by an agency of the State to serve a public purpose, all persons have equal rights, while in another portion, also serving the public, a Negro is a second-class citizen, offensive because of his race, without rights and unentitled to service, . . .

The discount on ticket prices for women was not calculated to nor is it contended that it did cause the respondent to feel unwelcome, unaccepted, undesired or unsolicited.

It is true that, as the respondent points out, the use of the word "includes" indicates that the term "full enjoyment" may include forms of discrimination which do not cause a person to feel unwelcome. Still, the statute read as a whole contemplates that forbidden discrimination be damaging in its effect, and as we have shown, there was no damage.

In support of his claim of discrimination, the respondent cites *Anderson v. Pantages Theatre Co.*, 114 Wash. 24, 194 P. 813 (1921). There a black man who had purchased tickets for box seats in a theater was denied access to those seats and was told that he must sit in the balcony. This court found such treatment to be in violation of a statute imposing a criminal penalty upon anyone denying to a person, because of his race, the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any

---

[2]*See Moose Lodge 107 v. Irvis*, 407 U.S. 163, 172–75, 32 L. Ed. 2d 627, 92 S. Ct. 1965 (1972).

place of public resort, holding that the statute was also intended to provide a civil remedy. The case is distinguishable not only in that the plaintiff there was denied access to the seat which he had purchased, but also in that he was indeed unwelcome and was made to feel so.

We conclude that the discount of ticket prices for women did not violate RCW 49.60.

## II

Did the trial court err when it refused to allow an amendment of the complaint after the summary judgment had been granted?

CR 15 permits the amendment of a complaint only by leave of court or by written consent of the adverse party, where a responsive pleading has been filed. It provides that leave shall be freely given "when justice so requires". Since the respondent suffered no damage but rather derived a benefit from the sale of tickets at reduced prices, the trial court was amply warranted in finding that justice would not be served by allowing an amendment of the pleadings to allege not different facts but a different legal theory of recovery.

The actual incentive for this lawsuit appears to be objection on the part of the respondent's attorney that promotional devices such as "ladies' night" tend to stereotype women. She cites in her brief an interview, reported in 65 A.B.A. J. 1619 (1979), wherein she states:

"The major concern has always been male and female stereotypes, which have the effect of perpetuating sex discrimination." The promotion, she charges, "is a come-on just to make money, because women are viewed as sex objects. It wasn't just to be nice to the ladies."

Whatever merit there may be in that objection, it is not at issue here and involves no injustice to the male plaintiff in this action.

Not only has the respondent shown no damage to himself, he has cited no judicial authority holding a comparable

practice discriminatory.[3]

If this case has any substance, it must rest upon a showing that there is discrimination against men in a citadel of masculine dominance—the men's professional basketball arena.

---

[3]The respondent has cited an administrative decision of the New York State Human Rights Appeal Board, dated July 19, 1972, in the case of Abosh v. New York Yankees, Inc., which was an application for an exemption under a local antidiscrimination code. The appeal board rather peremptorily sustained the decision of the New York City Commission on Human Rights denying the exemption. It declared that the promotional device did not accomplish its avowed purpose of encouraging women to attend; that it did not promote family bonds because large numbers of women have no husbands; and that "no woman who really cherishes her hard fought rights of equality under the Human Rights Law would accept preferential treatment at the expense of her male counterpart."

The factors considered by the New York Board indicate that it was more concerned with the efficacy of the program as an inducement to women than with its discriminatory effect on men. Having concluded that the program did not promote family bonds or stimulate female attendance, the Board denied the exemption. For aught that appears in the opinion, the exemption was denied because the program was unsuccessful. No attempt was made to construe the code provision. There is little in the reasoning to aid this court in resolving the question here. The decision is published in a text, B. Babcock, A. Freedman, E. Norton & S. Ross, *Sex Discrimination and the Law* 1069 (1975). The text writers, like the respondent's attorney, view the practice as disparaging to women. They quote a sociologist, Professor S. M. Miller (whose credentials are not revealed), who testified at the New York Commission hearing:

> *Miss Meyers:* What is your estimate as a sociologist of the effect on women of having a Ladies' Day at ball parks? Do you think they are significantly damaged by it?
>
> *Mr. Miller:* I don't know if it is damaging. I think it reinforces stereotypes.
>
> *Commissioner Norton:* What is the stereotype being reinforced here?
>
> *Mr. Miller:* Unathletic. Improvident. And also the notion of silly. Ladies' Day is a silly day. You expect to have silliness going on with a lot of shrieking and silliness because "that is the way women behave on public occasions."

For aught that is revealed here, the witness was testifying to his personal reactions, rather than with reference to some empirical study. This testimony suggests that at least a part of the objection to "ladies' night" is attributable to the use of the term "ladies" in an inappropriate setting. Judging from its alleged success at the Sonics Sunday night games, not all women have found that type of inducement offensive.

Noticeably missing from the quoted testimony of the sociologist is any assertion that this promotional device has an adverse effect on men.

The respondent has offered no reason why the owners of the team would be motivated to single out their own sex for discrimination, when that sex comprises their most dependable customers. To state the proposition is sufficient to establish its improbability.

In the absence of some showing that the prices charged were unreasonable or forbidden by statute, we perceive no reason for judicial intervention in ticket–pricing policies which are designed not to exclude anyone but to encourage attendance. It is not denied that the pricing policies at the Sonics games have furthered that purpose. Nor is there the slightest evidence offered that the respondent's disgruntlement is shared by any sizable number of fans. What evidence there is in the record shows the contrary.

According to the affidavit of the vice–president, a sizable majority of fans have indicated their approval of promotional programs such as "ladies' night". Perhaps the time will soon arrive when most will shun them. When that occurs, we would expect that the demands of the marketplace will dictate that the programs be abandoned.

█ It is the prevailing rule that one who seeks to challenge the constitutionality of a law or other governmental action, either on behalf of himself or a class which he represents, must show that the particular action complained of has operated to his prejudice. *State v. Rowe*, 60 Wn.2d 797, 376 P.2d 446 (1962); *State v. Kent*, 87 Wn.2d 103, 549 P.2d 721 (1976); *Standow v. Spokane*, 88 Wn.2d 624, 564 P.2d 1145 (1977); *State v. McCarter*, 91 Wn.2d 249, 588 P.2d 745 (1978); 16 Am. Jur. 2d *Constitutional Law* § 192 (1979); 16 C.J.S. *Constitutional Law* § 76 (1956). Such a showing has not been made here.

It is agreed by the parties that in order to maintain an action under the Equal Rights Amendment, Const. art. 31, § 1 (amendment 61), where the alleged discrimination has been effected by a private agency, it is necessary to show that some "state action" is involved. *See Darrin v. Gould*, 85 Wn.2d 859, 874, 540 P.2d 882 (1975). Inasmuch as we find that no cognizable discrimination was practiced against

the respondent, we need not consider the question whether the City's involvement, as lessor, was sufficient to justify invocation of the constitutional provision.[4]

To decide important constitutional questions upon a complaint as sterile as this would be apt to erode public respect for the Equal Rights Amendment and deter rather than promote the serious goals for which it was adopted.

The action of the Court of Appeals (*MacLean v. First Northwest Indus. of America, Inc.*, 24 Wn. App. 161, 600 P.2d 1027 (1979)) is reversed and the judgment of the trial court reinstated.

HICKS and WILLIAMS, JJ., concur.

BRACHTENBACH, C.J., and STAFFORD, J., concur in the result.

UTTER, J. (dissenting)—RCW 49.60, the Law Against Discrimination, bars gender–based price differentials regardless of the harm suffered. As that prohibition is absolute, the trial court's summary judgment was improper.

RCW 49.60.215 provides:

> It shall be an unfair practice for any person or his agent or employee to commit an act which directly or indirectly results in any distinction, restriction, or discrimination, or the requiring of any person to pay a larger sum than the uniform rates charged other persons, or the refusing or withholding from any person the

---

[4]We note, however, that the claim of City involvement is dubious. There is no dispute that the City, under the lease, had no voice in the setting of admission prices and in fact did not participate in that process. It retained the right to provide ticket takers, but they had no discretion with respect to prices to be charged. The lease expressly required compliance with laws against discrimination. This circumstance, among others, significantly distinguishes this case from *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961), much relied upon by the respondent. The fact that the City had not protested the practice of charging special prices on ladies' night does not establish that it condoned discrimination. Nothing that is alleged in this lawsuit indicates that, before it was brought, there was reason for city officials or anyone else to believe that the practice of charging special prices to certain groups was a forbidden type of discrimination, these pricing policies having the obvious purpose of encouraging attendance.

admission, patronage, custom, presence, frequenting, dwelling, staying, or lodging in any place of public resort, accommodation, assemblage, or amusement, except for conditions and limitations established by law and applicable to all persons, regardless of race, creed, color, national origin, the presence of any sensory, mental, or physical handicap, or the use of a trained dog guide by a blind or deaf person: . . .

It is like RCW 49.60.040 in that both fail to mention sex. But, regarding RCW 49.60.040, the majority concludes the omission must have been inadvertent and accordingly reads it into that statute.

As both statutes are directed at substantially the same class of persons, and use substantially the same language, RCW 49.60.215 must also apply to sexual discrimination. Such is required by the majority's discussion of RCW 49.60.040. It is required to effectuate the purposes of RCW 49.60.

RCW 49.60 was designed to eliminate gender discrimination. *Washington Water Power Co. v. State Human Rights Comm'n,* 91 Wn.2d 62, 66, 586 P.2d 1149 (1978); RCW 49.60.010. It objective is like that of public accommodation laws generally. Their purpose "is to make *equal access* to [public] places . . . a *public* right." (First italics mine.) Caldwell, *State Public Accommodations Laws, Fundamental Liberties and Enforcement Programs,* 40 Wash. L. Rev. 841, 842 (1965). Regarding our statutes, we have said that they confer "upon all persons . . . the right *to be admitted* to the places enumerated *on equal terms* . . ." (Italics mine.) *Anderson v. Pantages Theatre Co.,* 114 Wash. 24, 28, 194 P. 813 (1921); and "that a person may recover damages if he is denied the full privileges of" any public place. *Randall v. Cowlitz Amusements, Inc.,* 194 Wash. 82, 83–84, 76 P.2d 1017 (1938).

Given that purpose, its repeated pronouncement in our cases, and the gender references in companion statutes, both RCW 49.60.215 and RCW 49.60.040 must require equal sexual treatment. As such, RCW 49.60.215 expressly bars gender–based price differentials, while RCW 49.60-

.030(1)(b) and RCW 49.60.040 do so impliedly.

RCW 49.60.030(1)(b) states:

(1) The right to be free from discrimination because of race, creed, color, national origin, sex, or the presence of any sensory, mental, or physical handicap is recognized as and declared to be a civil right. This right shall include, but not be limited to:

. . .

(b) The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement;

And "full enjoyment" is defined in RCW 49.60.040 as including:

the right to purchase any service, commodity, or article of personal property offered or sold on, or by, any establishment to the public, and the admission of any person to accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement, without acts directly or indirectly causing persons of any particular race, creed, color, or with any sensory, mental, or physical handicap, or a blind or deaf person using a trained dog guide, to be treated as not welcome, accepted, desired, or solicited;

The majority reads those two statutes as barring only conduct which makes a person feel unwanted. But RCW 49.60.030 uses the phrase "include, but not be limited to"—a phrase that is inconsistent with such a reading. The word "include" is, by itself, an inclusive, not an exclusive, term; and certainly when used in the above phrase. In the context of these statutes, it is not intended to be a limitation on their scope, but rather only to illustrate possible applications. The scope of RCW 49.60.030 is thus broader than that suggested by the majority. In fact, the statute supports an unqualified right to be free of all sexual discrimination.

And, contrary to the majority's assertion, that right is not dependent upon proof of actual damages.[5] RCW 49.60-

---

[5]The majority concludes that RCW 49.60 is inapplicable because, under community property principles, respondent suffered no economic harm. The problem with that approach is illustrated by the following hypothetical. Suppose a hus-

.030(2), the remedy provision, provides:

> Any person deeming himself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, to recover the actual damages sustained by him, or both, together with the cost of suit including a reasonable attorney's fees or any other remedy authorized by this chapter or the United States Civil Rights Act of 1964;
> . . .

It does not require actual damages; it simply provides that they may be recovered, if present. It provides for either actual damages or an injunction. Nowhere does it suggest that the latter is conditioned upon the presence of the former.

No actual damages are required because, as recognized by RCW 49.60.010, gender discrimination can be per se injurious. The legislature has determined that such discrimination injures not only the victim but the state and the public in general. RCW 49.60.010 states:

> This chapter shall be known as the "law against discrimination". It is an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights. The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, creed, color, national origin, sex, marital status, age, or the presence of any sensory, mental, or physical handicap are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.

No tangible injury to the victim is necessary, for the State's interest by itself justifies any warranted legal challenge.

---

band and a wife have similar jobs at the same company and each is qualified for a promotion to a higher salaried position. Further, suppose that the wife gets the promotion solely because of her sex. Under the majority's approach, since the marital community receives the same economic benefit regardless of who is promoted, RCW 49.60 would not apply. Yet, in light of the legislative declarations, *see* RCW 49.60.010, such discrimination is patently antithetical to RCW 49.60.

In *Davis v. Department of Labor & Indus.*, 94 Wn.2d 119, 615 P.2d 1279 (1980), that principle was applied. There, an employer sexually discriminated against a woman seeking a promotion. Though there had been discrimination, no damages were awarded because, notwithstanding the disparate treatment, "she would not have been selected over the other two qualified persons." *Davis*, at 122. There was a violation of RCW 49.60, though the victim suffered no personal loss. The case reflects the principle that sexual discrimination harms the state generally and, as such, can be attacked despite an injury–free victim.

In *Browning v. Slenderella Sys.*, 54 Wn.2d 440, 443, 341 P.2d 859 (1959), that principle again, but less clearly, appears. There, a beauty salon subtly refused to serve a black woman. She sued for damages for "'embarrassment, humiliation, mental anguish and emotional shock'." This court, though finding discrimination, concluded that she had not suffered any compensable emotional distress. Notwithstanding that, it awarded her nominal damages of $100, which, suggests one commentator, was a penalty, not compensation. Note, *Torts—Violation of Civil Rights—Damages*, 35 Wash. L. Rev. 245, 247–48 (1960). And, even if actual damages were required, they are present in this case. Actual damages include noneconomic injury, such as injury to one's psyche and to interpersonal relationships. *See Anderson, supra; Browning, supra.*

Respondent alleges that the "ladies' night" promotion made him feel like his wife's "keeper" and injured his psychic well–being. Such allegations, had respondent been allowed to prove them, could establish actual damage. But, more importantly, respondent should have been allowed to show that he could suffer actual injury because of the stereotype created by such promotions.

There has been testimony that a "ladies night" reinforces the stereotype that women are unathletic, improvident, and silly. B. Babcock, A. Freedman, E. Norton & S. Ross, *Sex Discrimination and the Law* 1061, at 1069 (1975), citing New York City Commission on Human Rights, hearings

Jan. 14, 1971. It can suggest that they, as a class, have an antipathy to sports and that, absent an economic "bribe," they will not attend.

By granting the summary judgment, the trial court precluded respondent from establishing any actual damage. Because his allegations are sufficient to create a genuine issue of fact, and since RCW 49.60 is applicable to gender-based price differentials, a summary judgment was, I believe, inappropriate.[6]

For these reasons, I dissent.

DIMMICK, J., and RYAN, J. Pro Tem., concur with UTTER, J.

DOLLIVER, J. (dissenting)—The majority takes exception to what it presumes to be the ideological viewpoint of plaintiff and states that a judgment in favor of plaintiff "would be apt to erode public respect for the Equal Rights Amendment and deter rather than promote the serious goals for which it was adopted." I do not agree. While I concur that plaintiff is not entitled to recover damages, I believe he is entitled to injunctive relief.

The majority, however, attempts, by a variety of devices (e.g., community property, First Northwest Industries management rationale for "ladies' night") to force the entire transaction into a cash nexus. It argues that plaintiff "suffered no damage but rather derived a benefit from the sale of tickets at reduced prices". But, of course, the cash gain or loss which may or may not have been occasioned by the discriminatory practice is not the point of the Equal Rights Amendment. I had thought this had been settled in *Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975). That case involved discrimination against girls in high school interscholastic football competition and in which injunctive relief was granted under the Equal Rights Amendment. As

---

[6]As there is a bona fide RCW 49.60 issue, it is unnecessary to fully address the applicability of the state ERA. However, that provision, for the reasons given by Justice Dolliver, does prohibit gender-based promotions.

the concurrence in *Darrin* stated, it agreed with the result favoring the plaintiff

exclusively upon the basis that the result is dictated by the broad and mandatory language of Const. art. 31, § 1, Washington's Equal Rights Amendment (ERA). Whether the people in enacting the ERA fully contemplated and appreciated the result here reached, coupled with its prospective variations, may be questionable. Nevertheless, in sweeping language they embedded the principle of the ERA in our constitution, and it is beyond the authority of this court to modify the people's will. So be it.

*Darrin,* at 878 (Hamilton, J., concurring).

While the majority might feel that the plaintiff "suffered no damage but rather derived a benefit from the sale of tickets at reduced prices", it completely ignores the fact that the action is also brought for injunctive relief. So long as the focus of the case is on damages, it may well be this is not a case "when justice so requires" that leave to amend the complaint be "freely given" by the court. CR 15(a). But since the case also involves a request for injunctive relief under the Equal Rights Amendment then I believe justice requires that the amendment should have been allowed.

The Equal Rights Amendment, Const. art. 31, § 1 (amendment 61) is plain and straightforward. It reads:

Equality of rights and responsibility under the Law shall not be denied or abridged on account of sex.

In *Marchioro v. Chaney,* 90 Wn.2d 298, 582 P.2d 487 (1978), we held that, while under some circumstances a classification by sex is valid, there may be no discrimination as to sex. No matter how the majority struggles to get around the obvious, when men must pay more than women for admission to a sporting event, there is not only classification but discrimination as well. The Official Voters Pamphlet (1972), at page 52, contains this statement for the Equal Rights Amendment (HJR 61):

What is the Basic Principle of the Era [*sic*]?

It is that both sexes be treated equally under the law. The State could not pass or enforce any law which places

a legal obligation, or confers a special legal privilege on one sex but not the other.

For a man to be required to pay more than a woman for a similar admission ticket to a professional basketball game both places an obligation on him and gives a special privilege to the woman. It is a discriminatory act. The only question is whether this discriminatory act is covered by the Equal Rights Amendment. I believe that it is.

Both parties agree that whether the discrimination practiced by defendants is "under the law" (Const. art. 31, § 1) depends upon whether defendants were involved in "state action". Contrary to the majority, I find there is state action.

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961), requires a finding that the City's lease to FNI of the facility in which SuperSonics games are played makes the discriminatory pricing scheme state action. In *Burton*, the Supreme Court, while acknowledging that the determination of which types of conduct constitute state action must be made on a case–by–case basis, declared that the racially discriminatory conduct of a private party violates the Fourteenth Amendment if it occurs in space leased to the private party by a governmental entity. The Supreme Court found the leasing arrangement to be to the mutual benefit of the state agency and the private party:

> [T]he commercially leased areas were not surplus state property, but constituted a physically and financially integral and, indeed, indispensable part of the State's plan to operate its project as a self–sustaining unit . . .

(*Burton*, at 723–24), and concluded that:

> [W]hen a State leases public property in the manner and for the purpose shown to have been the case here, the proscriptions of the Fourteenth Amendment must be complied with by the lessee as certainly as though they were binding covenants written into the agreement itself.

*Burton*, at 726.

As in *Burton*, the City here leased its facility to FNI to

insure that the facility had an income and to make it a justifiable governmental endeavor as a center of social activity for the citizens of the City and the surrounding area. The City is responsible for "[u]pkeep and maintenance of the building, including necessary repairs, . . . payable out of public funds." *Burton,* at 724. The parties' contract is such "that profits earned by discrimination [in pricing policies] not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." *Burton,* at 724. Indeed, in this case the connection is even greater than that in *Burton.* Here the lessee must hire the City's employees, and returns a portion of receipts from ticket sales as rental. The City also reserves "the right to sell librettos, bouquets, refreshments and other merchandise." It directly benefits from sales to spectators admitted under the discriminatory pricing scheme.

The City made available a public facility, staffed with public officials and policed by public safety officers, for defendant's discriminatory pricing policies. It made no attempt to insure a nondiscriminatory ticketing scheme, but continued to lend its "power, property and prestige" to the Seattle SuperSonics. *See Reitman v. Mulkey,* 387 U.S. 369, 380, 18 L. Ed. 2d 830, 87 S. Ct. 1627 (1967). Although each case considering the existence of state action must be individually determined, it is clear that *Burton* applies here. This case and the City's participation in this scheme are distinguishable from, for instance, *Moose Lodge 107 v. Irvis,* 407 U.S. 163, 32 L. Ed. 2d 627, 92 S. Ct. 1965 (1972); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 42 L. Ed. 2d 477, 95 S. Ct. 449 (1974); *Kennebec, Inc., v. Bank of the W.,* 88 Wn.2d 718, 565 P.2d 812 (1977); *Faircloth v. Old Nat'l Bank,* 86 Wn.2d 1, 541 P.2d 362 (1975), all of which involved only statutory or administrative authorization of purely private actions. Under the facts before us, with the lease of a public facility it cannot be said that the pricing scheme in this case was not state action. *See Jackson v. Metropolitan Edison Co., supra* at 358.

It has been suggested that a more stringent standard of

state action is to be applied in cases involving sex rather than race discrimination. *See Weise v. Syracuse Univ.*, 522 F.2d 397 (2d Cir. 1975); 21 Vill. L. Rev. 973 (1976). However, the strict scrutiny analysis of *Burton* should be followed if examination of state action is necessary. Sex classifications have been given strict scrutiny under equal protection analysis in this state since the case of *Hanson v. Hutt*, 83 Wn.2d 195, 517 P.2d 599 (1973). The examination of alleged sexual discrimination in this state thus should stand on the same footing and analysis as racial bias. *See also Darrin v. Gould*, 85 Wn.2d 859, 871, 540 P.2d 882 (1975); *Seidenberg v. McSorleys' Old Ale House, Inc.*, 317 F. Supp. 593 (S.D.N.Y. 1970) (issuance of liquor license to place of public accommodation constitutes state action that prevents exclusion of women); *accord, Bennett v. Dyer's Chop House, Inc.*, 350 F. Supp. 153 (N.D. Ohio 1972).

Finally, application of the Equal Rights Amendment to defendants' actions in this case is required by ordinance and by the parties' lease agreement. In *Burton*, the Supreme Court twice noted that a requirement in the lease that the private party abide by the Fourteenth Amendment would quite clearly have been enforceable:

> [I]n its lease . . . the [governmental entity] could have affirmatively required [the private party] to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. . . .
> . . . [T]he proscriptions of the Fourteenth Amendment must be complied with by the lessee as certainly as though they were binding covenants written into the agreement itself.

*Burton*, at 725–26. That is precisely the approach taken by the City in this case. By ordinance, FNI agreed "to comply with all state and local laws prohibiting discrimination with regard to race, color, creed, sex, age, or national origin." Seattle City Ordinance 103025; *see also* lease agreement at 6; Addendum I to lease agreement "Seattle Center Tenant Rules and Regulations", at 2. Although the City may have thereafter attempted to "abdicate its responsibilities by

either ignoring them or by merely failing to discharge them whatever the motive may be" by allowing discriminatory pricing (*Burton*, at 725), leasing provisions clearly require that the defendant comply with the Equal Rights Amendment in establishing the pricing policies.

The majority maintains in note 4 that since in the lease the City "expressly required compliance with laws against discrimination", it is distinguishable from *Burton*. As indicated above, I believe this strengthens rather than weakens plaintiff's case. The decisive act involving state action is the lease by the City of Seattle to FNI and the interrelationship between these parties. As pointed out above, the "symbiotic relationship" between the City and FNI was even more intimate than that of the State and the restaurant owner who discriminated in *Burton*. *Jackson v. Metropolitan Edison Co., supra* at 358. The majority's observation that the City did not participate in setting ticket prices can hardly be more relevant than that the State did not set the menu prices in *Burton*.

It may be that application of the Equal Rights Amendment to the "promotional" activity of defendant is not the sort of thing the voters had in mind when they adopted HJR 61. Then again, an equally persuasive argument could be made that ticket price differentials based on sex were indeed one of a number of activities which they hoped to end. It is idle to speculate. No evidence of any kind exists. I see no escape from finding in this case that the plain language of Const. art. 31 proscribes the activity in which the defendants have engaged. Any further clarification of popular intent must come through the process of constitutional amendment, not by the imaginings of this court. Const. art. 23.

I dissent.

Reconsideration denied December 22, 1981.