[No. 7126–6–II.   Division Two.   February 11, 1985.]

EVERGREEN SCHOOL DISTRICT NO. 114, *Respondent*, v. THE HUMAN RIGHTS COMMISSION, *Appellant*.

*Kenneth O. Eikenberry, Attorney General, Morton M. Tytler, Senior Assistant,* and *Mary M. Tennyson, Assistant,* for appellant.

*Bart Waldman,* for respondent.

REED, A.C.J.—The Washington State Human Rights Commission appeals from a judgment of the Superior Court for Clark County that reversed a hearing tribunal's award to a black student of $1,500 for embarrassment and humiliation suffered as a result of a teacher's racially offensive classroom remark. Evergreen School District No. 114 cross–appeals the court's affirmance of the tribunal's conclusion that Evergreen committed an unfair practice in violation of state law and its order that Evergreen cease and desist from any further "unfair practices." Finding no unfair act or practice we reverse that portion of the Superior Court's order, and vacate the tribunal's order.

Our review is governed by the administrative procedure act, RCW 34.04, and is confined to the record made

before the tribunal. *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983). Thus, under RCW 34.04.130(6), this court may reverse the tribunal's decision if its

administrative findings, inferences, conclusions, or decisions are:

(a) in violation of constitutional provisions; or

(b) in excess of the statutory authority or jurisdiction of the agency; or

(c) made upon unlawful procedure; or

(d) affected by other error of law; or

(e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or

(f) arbitrary or capricious.

The facts as found by the hearing tribunal not being disputed, the issue is whether the tribunal erred as a matter of law in concluding that Evergreen was guilty of a discriminatory act or practice under RCW 49.60.215. The answer to this question must be in the affirmative.

The facts, as found by the tribunal, are as follows:

1. The Complainant Margie Johnson, filed a discrimination complaint against the Respondent, Evergreen School District No. 114, on behalf of her daughter, Karen Johnson, with the Washington State Human Rights Commission, on January 23, 1976.

2. At the time that Margie Johnson filed the discrimination complaint with the Commission, Karen Johnson was 13 years old. Margie Johnson and Karen Johnson are black.

. . .

6. Karen Johnson was enrolled in the 7th grade at Cascade Junior High School during the 1974–75 school year.

7. During Karen Johnson's 7th grade school year, she was enrolled in a math class taught by Mr. Philip Luke. During the second trimester of that school year (between December 1974 and February 1975), Mr. Luke made a remark in class that was racially offensive. The remark was a blunder rather than a planned racial slur.

8. Mr. Luke's remark was particularly offensive to Karen Johnson as a black student. Karen Johnson was

the only black student in this class.

9. At the end of class, Mr. Luke apologized to Karen Johnson for the remark he made in class. Later in the school day, Mr. Luke reported the incident in his class to Mr. Jack Wright, principal at Cascade Junior High School, who cautioned Mr. Luke to be sensitive to making racially offensive remarks and told Mr. Luke to call Margie Johnson, Karen Johnson's mother, and apologize to her. Mr. Luke did call and apologize to Mrs. Johnson.

10. Mr. Luke had an otherwise exemplary teaching record in the Evergreen School District and was visibly upset by this incident. In Mr. Wright's view, Mr. Luke had learned his lesson and did not deserve further disciplinary action at that time.

11. Although at some point Karen Johnson discussed the incident in Mr. Luke's class with three other teachers at Cascade Junior High School, neither Karen Johnson nor Margie Johnson complained about this incident to School District administrators or officials.

12. While Mr. Wright counseled Mr. Luke on the need to be sensitive to remarks made in the presence of minority students, he did not at that time, as a result of this incident, take any further steps to make other teachers at Cascade Junior High School sensitive to avoid classroom conduct which offends minority students.

13. The remark reported by Mr. Luke was the first time that any concern about a teacher's racially offensive remark had been reported in the Evergreen School District.

14. Karen Johnson was enrolled in the 8th grade at Cascade Junior High School during the 1975–76 school year.

15. During Karen Johnson's 8th grade school year, she was enrolled in a history class taught by Mr. Kenneth Wainwright. Karen Johnson was the only black student in this history class.

16. During a history class in January 1976, a student reading the class lesson mispronounced the word "depot." Mr. Wainwright offered an illustration to his class which he believed would reinforce the proper pronunciation of the word "depot."

17. The illustration used by Mr. Wainwright in class referred to a black boy who similarly mispronounced the word depot as "dee pot" (rhyming with "tea pot"). This

illustration (which referred to a black boy who used the word "depot" in a sentence thus: "My mama put de pot under de bed") reinforced an unacceptable black stereotype. Karen Johnson was present in the classroom when this illustration was used.

. . .

19. At Mrs. Margie Johnson's request, Mr. Eugene Hapala, associate principal at Cascade Junior High School, set up a meeting to discuss the incident in Mr. Wainwright's class. Margie Johnson, Karen Johnson, Mr. Hapala, and Mr. Wainwright were present at this meeting. Mr. Wainwright admitted using the "depot" illustration in class and said that he did not consider the "depot" illustration to be racially offensive.

20. Following this meeting, the Cascade Junior High School principal, Jack Wright, counseled Mr. Wainwright on what was wrong with his illustration and the need to be more sensitive to comments which could be offensive to minority students.

21. Thereafter, Mr. Wright issued a formal written reprimand to Mr. Wainwright.

22. Following this incident, School District officials discussed it at a Secondary Council meeting, at which all secondary school administrators were present. Each principal was instructed to discuss with his/her faculty the need to be sensitive to making remarks in the classroom which could be offensive to minority students. Complying, Mr. Wright held such a discussion with the faculty members at Cascade Junior High School.

23. Subsequent to the Wainwright incident, the School District has received no reports or complaints of racially offensive remarks being made by its teachers.

24. Mr. Wainwright's "depot" illustration was racially offensive, particularly to Karen Johnson as a black student.

25. Prior to the incident in Mr. Wainwright's class in January 1976, neither the Evergreen School District nor Cascade Junior High School had made any specific efforts to sensitize teachers to classroom conduct which could offend minority students.

26. There was no racially hostile environment or pattern of discrimination in the Evergreen School District during the years that Karen Johnson attended its schools. The School District received no complaints of

mistreatment of minority students except as reported by the Johnsons after the Wainwright incident. There have been no other complaints of mistreatment of minority students up to the present time, despite a substantial and rapidly growing enrollment of minority students.

27. As a result of the racially offensive "depot" illustration used by Mr. Wainwright in a classroom at Cascade Junior High School within the Evergreen School District, Karen Johnson suffered embarrassment and humiliation.

. . .

29. Ordering the school district to pay $1,500.00 to Karen Johnson to compensate her for humiliation and mental suffering will effectuate the purposes of Chapter 49.60 RCW, Washington's Law Against Discrimination.

30. The erosion of Karen Johnson's relationship with her mother, Margie Johnson, was not proximately caused by her classroom experiences at Cascade Junior High School.

31. Karen Johnson's decline in school performance in high school and eventual dropping out of school during her junior year in high school were not proximately caused by her classroom experiences at Cascade Junior High School.

32. Since the Wainwright incident in January 1976, the School District has taken some affirmative steps to remedy the concerns raised by the Wainwright illustration. In light of these steps, the time that has passed since the Wainwright incident, and the fact that no subsequent problems have arisen, the Tribunal finds that the evidence does not warrant the ordering of further affirmative relief.

Based upon these findings the tribunal entered the following conclusions of law:

2. Cascade Junior High School, operated by Evergreen School District No. 114, is a place of public resort, accommodation, assemblage, or amusement within the meaning of RCW 49.60.215.

3. The Evergreen School District, as the operator of public schools including Cascade Junior High School, has a duty under the law against discrimination and particularly RCW 49.60.215, to provide equal access for students of all races to enrollment in school and to all school acti-

vities.

4. The Evergreen School District is not strictly liable under RCW 49.60.215 for every racially offensive statement made by a teacher or student while on school premises. However, the School District has a duty to provide an educational environment free from teacher bias in the classroom, and becomes legally liable under RCW 49.60.215 for failure to do so where it has prior notice there may be problems of this nature in its classrooms and fails to take steps to solve or prevent them.

5. The inadvertent but offensive remark by Mr. Luke during the 1974–75 school year put the District on notice that there was a potential for other teachers to make similarly offensive remarks. Because the School District failed to respond to this potential problem by taking affirmative steps to sensitize teachers to avoid classroom conduct which could be offensive to minority students, the District must bear legal responsibility for the January 1976 illustration which Mr. Wainwright used in his classroom. Mr. Wainwright's "depot" illustration did not reinforce the proper pronunciation of the word "depot" but rather reinforced a black stereotype that has no place in a school classroom. Under the circumstances, the teacher's use of this illustration, embarrassing as it did Karen Johnson because she is black, constitutes an unfair practice under RCW 49.60.215.

6. The Complainant, Margie Johnson on behalf of Karen Johnson, is entitled to compensation for embarrassment and humiliation in the amount of $1,500.00 plus interest at 10 percent per annum from the date of entry of the final order of the Hearing Tribunal.

RCW 49.60 sets forth this state's Law Against Discrimination.[1] RCW 49.60.030 recognizes a "civil right" to be free from discrimination because of race, creed, color, national origin, sex, or the presence of certain handicaps. The right is defined as including "The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement". RCW 49.60.030(1)(b). Under RCW

---

[1] RCW 9.91.010, which punishes discrimination as a misdemeanor, is known as our "public accommodation statute." *Browning v. Slenderella Sys.*, 54 Wn.2d 440, 341 P.2d 859 (1959).

49.60.040 an "educational institution" is a place of "public accommodation", and "full enjoyment of" is defined as including:

> the admission of any person to accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement, without acts directly or indirectly causing persons of any particular race, creed, color, . . . to be treated as not welcome, accepted, desired, or solicited;

RCW 49.60.215 defines unfair practices of places of public resort or accommodation as follows:

> It shall be an unfair practice for any person or his agent or employee to commit an act which directly or indirectly results in any distinction, restriction, or discrimination, or the requiring of any person to pay a larger sum than the uniform rates charged other persons, or the refusing or withholding from any person the admission, patronage, custom, presence, frequenting, dwelling, staying, or lodging in any place of public resort, accommodation, assemblage, or amusement, except for conditions and limitations established by law and applicable to all persons, regardless of race, creed, color, national origin, the presence of any sensory, mental, or physical handicap, or the use of a trained dog guide by a blind or deaf person: . . .

It is under this latter statute that the Commission charged and the tribunal found that, because of Wainwright's "depot" illustration, Evergreen committed a racially discriminatory act or practice. As indicated, we do not agree.

In our view, the hearing tribunal's own findings do not support its legal conclusion that Evergreen committed an unfair practice, as that term is defined by RCW 49.60-.215 and its complementary statutes. As noted, the tribunal did not determine that Wainwright's conduct, standing alone, was an unlawful act or practice, for which Evergreen bore strict liability under the statute. Rather, the tribunal determined that his remark qualified as such a practice *only* because Evergreen failed to prevent the incident by implementing a more effective teacher sensitization program after the Luke incident. In essence—as recognized by

the Commission in its brief—Evergreen was held liable for Wainwright's act on a theory of negligence. We find no support, statutory or otherwise, for the proposition that a school district has any affirmative duty to "sensitize" teachers. Until the Commission has acted in response to a complaint and the hearing tribunal[2] has found an unfair practice, the Commission has no authority to require any affirmative action, even though it concludes such action is necessary to prevent further acts of discrimination. RCW 49.60.230, .240, .250. Every other tribunal finding militates against its conclusion of an unfair practice, as we shall demonstrate.[3]

■ The Commission argues that Karen was denied equal access to and full enjoyment of her school and classroom because Wainwright's illustration made her *feel* unwelcome or unaccepted. We cannot agree. First, the tribunal's findings do not address how Karen "felt" as a result of the remark, except to state she suffered embarrassment and humiliation. Be that as it may, there is no finding that the incident caused Karen to be *treated* any differently by her teachers or classmates. The remark was not directed at her personally, nor was it inspired or motivated because she was present in class. The "depot" illustration, while it may have been thoughtless and without regard for her sensitivities, was not offered or intended to cause her embarrassment or upset. Rather, it was spontaneous and inadvertent and not part of any ongoing campaign, pattern or practice reasonably calculated to cause any black child to be treated as unaccepted or unwelcome. Nor was the example completely gratuitous or without any redeeming instructional

---

[2]Administrative law judges now have replaced the hearing tribunal. RCW 49.60.250.

[3]Because we find no unfair practice in Wainwright's classroom example, we need not address Evergreen's contention that the statute does not impose strict vicarious liability for the acts of its employees and agents, and that something more is required, such as proof of knowledge, condonation, or ratification by the District.

feature. Although the tribunal's opinion was that it had no utility value and served only to perpetuate or reinforce a "black stereotype," it was at least germane to the pronunciation issue before the class. The tribunal did find, after all, that none of the school's black children (presumably including Karen) suffered any mistreatment, and that there was no "racially hostile environment or pattern of discrimination . . . during the years that Karen Johnson attended its schools". The tribunal also found that Karen's leaving school could not be attributed to the incident.

Wainwright's illustration arguably could be indicative of his lack of sensitivity or latent prejudice, but, as stated in *Howard v. National Cash Register Co.*, 388 F. Supp. 603, 606 (S.D. Ohio 1975):

> The Archie Bunkers of this world, within limitations, still may assert their biased view. We have not yet reached the point where we have taken from individuals the right to be prejudiced, so long as such prejudice did not evidence itself in discrimination. This Court will secure plaintiff against discrimination; no court can secure him against prejudice.

The Commission notes that our Supreme Court, in *MacLean v. First Northwest Indus. of Am., Inc.*, 96 Wn.2d 338, 635 P.2d 683 (1981), uses terms such as "cause a person to feel unwelcome," and "he was indeed unwelcome and was made to feel so," when describing certain discriminatory practices. However we do not believe the court meant to enlarge upon the statute, which makes *treatment* the basis for liability, not a complainant's subjective feelings. The *MacLean* court was referring to the plaintiff in *Anderson v. Pantages Theatre Co.*, 114 Wash. 24, 194 P. 813 (1921), who, as we shall later point out, *felt unwelcome* because he had indeed been *treated as unwelcome.* In our opinion it is not enough that some hasty, chance or inadvertent word or action may offend or even make one *feel* unwelcome. Personal sensitivities differ greatly from one individual to another. The Legislature could not have intended to proscribe mere rhetoric that is subjectively offensive to a par-

ticular person. Rather, the test is objective and requires a finding of a particularized kind of treatment, consciously motivated by or based upon the person's race or color. As noted in *MacLean,* at 344, "the term 'full enjoyment' may include forms of discrimination which do not cause a person to feel unwelcome."

Fortunately, Washington has few reported cases involving racial discrimination. Perhaps this can be attributed to the Commission's mandate to resolve complaints through its comprehensive conciliatory procedures. RCW 49.60.240.[4]

The few cases we do have easily can be distinguished. For instance, Wainwright's classroom example is a far cry from the conduct involved in *Anderson v. Pantages Theatre Co., supra.* There, Mr. Anderson, because he was a black man, was told he could sit only in the balcony although he held tickets for box seats. So also does Karen's situation differ vastly from that of the black lady, who, although not turned away outright, effectively was denied a reducing salon's services because of her race. *Browning v. Slenderella Sys.,* 54 Wn.2d 440, 341 P.2d 859 (1959). *See also Randall v. Cowlitz Amusements, Inc.,* 194 Wash. 82, 76 P.2d 1017 (1938).

The Commission argues that mere insults or racial slurs can amount to discrimination under our statute, citing to *Minneapolis v. Richardson,* 307 Minn. 80, 239 N.W.2d 197, 85 A.L.R.3d 389 (1976); *Wiggs v. Courshon,* 355 F. Supp.

---

[4]After reviewing the 565 pages of record, amassed as this matter proceeded from initial complaint in 1976 to tribunal hearing in 1982, we are left with the firm conviction that the Commission's zeal was misdirected. Instead of diligently pursuing conciliation (a condition precedent to formal action, *see Skold v. Johnson,* 29 Wn. App. 541, 630 P.2d 456 (1981); *Loveland v. Leslie,* 21 Wn. App. 84, 583 P.2d 664 (1978)), the Commission seemed bent on punishing Evergreen for what, in our opinion, was at most borderline conduct.

Had Evergreen kept alive its efforts to dismiss these proceedings for failure to conciliate in good faith, we would be hard put not to find "clearly erroneous" the tribunal's finding to the contrary. Evergreen appears to have cooperated throughout, rebelling only at the Commission's insistence that *any* resolution include a payment of money damages. At one point Evergreen actually signed a conciliation agreement, only to have the Commission repudiate the agreement ostensibly because its representative did not have binding authority.

206 (S.D. Fla.), *appeal dismissed,* 485 F.2d 1281 (5th Cir. 1973); *King v. Greyhound Lines, Inc.,* 61 Or. App. 197, 656 P.2d 349 (1982). Again, however, we find in these cases no parallel to Karen's experience. In *Richardson,* police officers directed ugly racial slurs at a 12–year–old black youth during his arrest and booking on criminal charges. The hateful epithets were coupled with actual physical and mental mistreatment—such as threatening the lad with a vicious police dog. In the circumstances, it is not surprising that the court found the youth had been the object of discriminatory treatment of the most blatant kind. *Courshon,* a tort case, did not involve the construction or application of an antidiscrimination statute and thus provides no guidance.

Of all the cases cited by the Commission, *King v. Greyhound Lines, Inc., supra,* comes closest to the mark. However, again we find significant dissimilarities between the conduct of Greyhound's ticket agent and Evergreen's teacher. The case is informative nevertheless because Oregon's Public Accommodations Act uses our statute's terms: "distinction, discrimination, or restriction." In *Greyhound,* Mr. King was subjected to racial epithets and slurs as he attempted to secure a ticket refund. Concededly these were deliberate and meant to impugn his honesty, and were coupled with demands and conditions not imposed on others seeking like refunds. Reversing the trial court's refusal to find a statutory violation, the Oregon Court of Appeals stated: "the statutory prohibition against 'distinction, discrimination or restriction' on the basis of race encompasses more than the outright denial of service. It also proscribes serving customers of one race in a manner different from those of another race." *Greyhound,* at 202.

Confronted with the same facts, we would have no difficulty reaching the same result under our statutes. Greyhound's ticket agent committed a flagrantly unfair act or practice. As evidenced by the racial slurs, the agent deliberately treated Mr. King as not welcome or desired because he was black, and served him in a much less satisfactory

way than was customary. However, *Greyhound* does not stand for the proposition that a random, inadvertent reference to a real or imagined racial characteristic constitutes discrimination when it is not abusive, is not directed at the complainant, and is not accompanied by disparate treatment because of race or color.

Lest we be misunderstood on this issue, we accept the proposition that

> "The basic violation of the Public Accommodations law is a denial of full and equal services at a covered establishment. *Such a denial occurs when there is discriminatory or abusive treatment, service or charges.* At present, complaints of insulting or discriminatory treatment *intended to discourage certain customers* are as common as complaints of outright refusals of entry. Exclusion and unequal treatment which form the core of any public accommodation violation are covered by all statutes." *Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Law*, 7 NYU Rev of Law and Social Change, 215, 244 (1978).

(Italics ours.) *Greyhound,* at 202. We also agree with *Greyhound*'s observation that:

> There is little legislative history describing what is meant by the terms "distinction, discrimination or restriction." . . . However, it is clear that the general intent of the legislation . . . was to prevent "operators and owners of *businesses* catering to the general public from subjecting Negroes to oppression and humiliation * * *" To hold that verbal *abuse* can be a "distinction, discrimination or restriction" on the basis of race is consistent with this broad legislative purpose.

(Citation omitted. Last italics ours.) *Greyhound,* at 202–03.

We also accept the concept that: "one need not be obvious or forthright to effect a discrimination . . . discrimination may arise just as surely through 'subtleties of conduct' as through an openly expressed refusal to serve." *Browning v. Slenderella Sys., supra* at 444. However, Wainwright's example did not involve intended–though–subtle insult, or abusive or unequal treatment because of race or color. Nor

was his comment part of a pattern or practice of disregarding black sensitivities by the continual use of racial homilies, references or animadversions, the probable effect of which would be to deprive black students of their full enjoyment of the classroom experience. All we have here is a spontaneous, ill–advised teaching example, to which Karen was particularly sensitive, and that caused her to feel embarrassment and humiliation.

If we were to accept the Commission's urgings, would it not also be an unfair practice for a teacher to include in a reading assignment such works as *Uncle Remus, Huckleberry Finn, Black Sambo, Uncle Tom's Cabin* and many other classics we could name? It is known that the presence of such works on the shelves of schools and libraries has led to vigorous efforts to ban or remove them. Arguably these efforts implicate the "delicate balance" between one's civil rights and other fundamental freedoms, such as that of speech. Until now, however, no one to our knowledge has suggested that merely employing such literary works to achieve legitimate educational ends amounts to unlawful discrimination and subjects the public facility, its board and its employees to sanctions under our statutes.

We concede that RCW 49.60.215 is unartfully drawn. However, we cannot accept the Commission's interpretation, which would mean that the statute must be emasculated to read as follows:

> It shall be an unfair practice for any person or his agent or employee to commit an act which directly or indirectly results in any distinction, restriction or discrimination, except for conditions and limitations established by law, and applicable to all persons, regardless of race, creed, color, etc. . . .

By thus taking out of context and placing total emphasis upon the phraseology "distinction, restriction, or discrimination", and ignoring the rest of the statute, the meaning of these terms is totally lost; the words become ambiguous to say the least, and shed absolutely no light on their legislative meaning. In common usage the words are synonymous

and may connote anything from the salutary to the reprehensible, thus leaving it to the unbridled whim and caprice of the Commission to determine their meaning in a particular case. On the other hand, when the terms are read in harmony with the rest of the statute,[5] their meaning becomes clear. The statute's primary thrust is to the refusing or withholding of admission to places of public accommodation, and the use of their facilities on an equal footing with all others. After factoring in the definition of "full enjoyment," if it is found that the refusal or withholding of admission or use was motivated by race or color, an unlawful distinction, restriction or discrimination has been proved.

In sum, we hold that Wainwright's illustration was not an unfair act or practice within the meaning of our statutes. Nor did Evergreen's failure to instill in its teachers a greater degree of sensitivity regarding future offensive remarks vault Wainwright's example into that category. Because we find no unfair practice, we need not address the Commission's appeal.[6]

We reverse that portion of the Superior Court's order affirming the hearing tribunal's conclusion that Evergreen committed an unfair practice and vacate the tribunal's cease and desist order in its entirety.

PETRICH, J., and PETRIE, J. Pro Tem., concur.

After modification, further reconsideration denied March 11, 1985.

---

[5]RCW 49.60.215, in pertinent part, is found at page 770 of this opinion.

[6]The Legislature in response to *Human Rights Comm'n v. Cheney Sch. Dist. 30*, 97 Wn.2d 118, 641 P.2d 163 (1982), amended RCW 49.60.250 in 1983, to empower the administrative law judge to award damages not exceeding $1,000 for "humiliation and mental suffering." (Laws of 1983, ch. 293, § 1.) In an extremely well reasoned and articulated opinion, Division One of this court has sustained the Commission's contention that this change, being remedial in nature, is to be applied retroactively. *Marine Power & Equip. Co. v. Human Rights Comm'n Hearing Tribunal*, 39 Wn. App. 609, 694 P.2d 697 (1985).